# J. FORD DORRANCE

## *vs.*

# WILMER P. HOOPES.

*Master and servant*: *discharge; insolence; provocation; question
for jury.   Court and jury*: *province of—.   Prayers*:
*rejection of all—.*

Although all the prayers of both sides are rejected, a case
may go to the jury without any instructions from the Court.
The practice is not one that is commended.         p. 396

Questions of law are for the Court, while mixed questions
of law and fact are for the jury, with proper instructions by
the Court as to the law.                            p. 351

It is only for breaches of an express or implied condition of
a contract, that either of the parties may put an end to it.
                                                    p. 350

A servant employed, under a contract, for a definite term,
may, for sufficient cause, be discharged before the expiration of
the term.                                           p. 350

To afford legal justification for the discharge of a servant
before the expiration of the term of his employment, his mis-
conduct must be grave, or such as to be incompatible with the
relation, pernicious in its influence, or injurious to the master's
business.                          p. 350

In determining such questions, reference must be had to the
business or employment in which it arose, and the relative
social condition of the master and servant.          p. 350

Previous provocations by the master, will sometimes render
excusable words which, apart from that element, would consti-
tute good ground for dismissal.                     p. 351

What constitutes good and sufficient cause for the discharge of a servant is a question of law, and where the facts are undisputed it is for the Court to say whether the discharge was justified.                                                            p. 351

Insolence to the employer or a member of his family is a valid reason for such discharge.                              p. 351

In general, whether the words complained of, as an excuse for the discharge of a servant were so insolent as to be incompatible with the continuance of the relation of master and servant, and whether there was any provocation to excuse the remarks, are questions for the jury upon instructions from the Court.                                                        p. 354

*Decided January 14th, 1914.*

Appeal from the Circuit Court for Harford County. (HARLAN, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Philip H. Close*, for the appellant.

*H. A. Whitaker*, for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a judgment entered on a verdict rendered in favor of the appellee (plaintiff) against the appellant (defendant). The declaration originally contained seven common counts and was afterwards amended by adding an eighth count. A demurrer to it having been sustained, the first seven counts were stricken out and the eighth, as amended by interlineations, was refiled. That count is on an agreement under seal, by which the appellant agreed to hire the appellee for eleven months—from the first day of April,

1912, to the last day of February, 1913, inclusive, for $60 per month, to be paid in cash bi-monthly, and in addition appellant was to furnish appellee a dwelling house, garden, fire wood, feed for one cow, and the right to the use of a horse for driving at times to be agreed upon between the parties. The appellee was employed to do general farm work under the direction of the appellant, and in the absence of the latter he was to exercise supervision over the work on the farms, also to supervise and assist in the care of the orchard and the trimming and spraying thereof, and to do other necessary work in connection therewith. He was also to do such other work on the farms named in the agreement as might be suggested by the appellant. The *narr.* alleges that the plaintiff entered upon the service and so continued until the defendant, before the expiration of the eleven months, dismissed him from his service, and refused to retain him for the remainder of said time; whereby he was deprived of the wages, profits and privileges which he would have derived, except $25 per month, which he had been able to earn elsewhere.

The plaintiff offered three prayers and the defendant two, all of which were refused. The only exceptions in the record are to the refusal of the lower Court to grant the defendant's two prayers and to pass upon his special exception to the plaintiff's first prayer, but as the Court rejected the plaintiff's prayer, that special exception is immaterial. As all of the prayers were rejected, the case went to the jury without any instructions by the Court, but while that is to be regretted and is not a desirable practice, especially in cases of this kind, we are only called upon to determine whether there was reversible error in rejecting the defendant's prayers, which are as follows:

*Defendant's First Prayer.*—"If the jury find that the plaintiff was employed by the defendant under the contract of May 1st, 1912, offered in evidence, then it became and was the duty of the plaintiff to obey all reasonable orders of the defendant, and to be loyal to, protect and safeguard the inter-

ests of the defendant in every reasonable way, and if the jury find that a difference arose between the defendant and the plaintiff, over the services of the plaintiff at the instance of the defendant to Joseph T. Hoopes, the father of the plaintiff, in the use of a sprayer for apple trees, and over the use of said sprayer and the bill for repairs thereto, and the plaintiff took the side of his father in said controversy and tried to force defendant to pay the bill for repairs to said sprayer presented by the said Joseph, and told the defendant he would believe the said Joseph in preference to believing the defendant in reference to said bill for repairs, and the defendant thereupon discharged the plaintiff and paid him up to the date of his discharge, then the plaintiff is not entitled to recover in this action, and the verdict of the jury must be in favor of the defendant."

*Defendant's Second Prayer.*—"If the jury find that the plaintiff was employed by the defendant under the contract of May 1st, 1912, offered in evidence, and that the plaintiff worked under said contract until July 8th, 1912, and that on or about said last named date differences arose between the defendant and the plaintiff growing out of the services of the plaintiff to Joseph T. Hoopes, the father of the plaintiff, the use of a sprayer for apple trees and the repairs thereto, and on said date the plaintiff brought up the question of the defendant's paying for said repairs, and insisted that the defendant should pay the same for the relief of said Joseph, and the defendant then and there declined to pay the same because not according to agreement, but the plaintiff insisted that the defendant should pay the same, and said he, the plaintiff, would believe the said Joseph in preference to the defendant, whereupon the defendant discharged the plaintiff and paid him his wages to the date of said discharge, then the plaintiff is not entitled to recover, and the verdict of the jury must be in favor of the defendant."

The only testimony in the case which tended in any way to question the faithful performance of the contract by the plaintiff, in respect to the manner and character of his work,

was that of the defendant himself. As the prayers offered do not rely on that, and as that was unquestionably for the jury and not for the Court to determine, we do not deem it necessary to refer to it further than to say that there was ample evidence tending to show that the plaintiff was competent and attentive to his duties. The defendant's testimony as well as that of the plaintiff and his father showed that the work done by the plaintiff on his father's orchard was by virtue of the contract between the defendant and Mr. Hoopes, Sr., and there was no dispute or difference between the plaintiff and the defendant on that subject. The question in dispute was whether the defendant or Mr. Hoopes, Sr., was to pay for the repairs of the sprayer. The defendant claimed that he was not to pay for them, while Mr. Hoopes, Sr., claimed that he had agreed to do so. The plaintiff bought some hose for the sprayer which the defendant paid for, apparently without objection. Later the plaintiff purchased some materials for repairs to the sprayer amounting to $11.23, which were charged to the plaintiff by the people in Rochester who furnished them. The dispute arose about those repairs. The plaintiff presented the bill for them to the defendant in June, but he declined to pay for them, and the plaintiff had promised the parties who furnished them that he would pay for them on July 10th. On July 9th he asked the defendant for some money which was due him for wages, as he said he did not have any, and could not pay the people in Rochester for the repairs unless he could obtain the money from the defendant. His testimony in the record is then as follows: "Besides that, I didn't feel it was my place to pay that bill; I got it for repairs to the sprayer that we would need to have to do the spraying properly. He said he had nothing to do with that; that was my father's place to settle that bill, that he had paid for the hose at Forest Hill and he thought that was enough. He hadn't paid for the hose. Q. He was charged with it, wasn't he? A. Yes, sir. Q. Go on. A. I told him I understood and believed he agreed to settle the account. He says, 'You mean I am a liar

then.' I says, 'I would take my father's word in preference to yours any time.' 'You are too G...... d...... smart; you can go hunt another job; I will settle with you.' That is all that was said. I didn't reply to him." That is the plaintiff's version of the dispute which resulted in his discharge. The defendant was asked: "When you explained to Mr. Hoopes this morning your position with reference to those bills, what did he say?" and replied: "He said, I would rather believe my father than you.' I said, 'Do you mean to say I am lying to you?' 'Well,' he said, 'I would rather believe him than you,' in a surly way. I said, 'You can look for another job.'" On cross-examination he said, "I discharged him because he called me a liar. Q. He didn't call you a liar? A. He did—the same thing," and later said, "I discharged him because he was insolent to me, intimated I was lying about his old sprayer. Q. Didn't you intimate his father was lying? A. Wait until I get through—I discharged him because he was incompetent and not on the job. He professed to be in the orchard business, and he didn't know any more about it than I do, and I don't know anything about it." Mrs. Dorrance, the wife of the defendant, testified in substance to the same effect as her husband as to what occurred at that time. Mr. Ray Thompson, who was the only disinterested witness present testified that "the plaintiff gave the bills to the defendant and defendant said he had nothing to do with them; that plaintiff told defendant that he had and said, 'Father says you did.' When the defendant said he had nothing to do with them, the plaintiff told defendant that he would believe his father before he would believe defendant; that defendant then said, 'You call me a liar, do you?' that there was some swearing after that, and defendant said, 'I will settle with you today, and you can look for another job.'"

Inasmuch as the main ground relied upon by the defendant for his right to discharge the plaintiff was what took place on July 9th, we have thus referred, somewhat at length, to the testimony of the witness who was present. It is, of course, conceded that although there is an agreement

employing a servant for a definite period, he may be dis-
charged by the master before the expiration of that period
for sufficient cause. What is a sufficient cause has been
before the courts of England and this country frequently,
and without attempting to state all of the obligations that
arise out of and are implied from the relation created by
such a contract, it is well settled that "It is only for breaches
of an express or implied condition of the contract that either
party can put an end to it; anything less than that is not a
legal excuse." *Wood on Master and Servant,* sec. 83, p.
166; *Ibid,* sec. 116, p. 220.

In section 109, on page 210, of that volume it is said:
"Mere misconduct, not amounting to insubordination, or
involving moral turpitude, or exercising a bad influence over
other servants, or producing injury to the master's business,
or members of the master's family, is not enough to warrant
the discharge of a servant. The misconduct must be gross,
or such as is incompatible with the relation, pernicious in
its influence, or injurious to the master's business; and, in
determining the question, reference must always be had to
the business or employment in which it arose, and the rela-
tive social condition of the master and servant. What might
be regarded as improper or insolent in a servant toward one
master, might not be so regarded toward another." While
the appellee was employed to do general farm work, he was
to have supervision over the farms in the absence of the
appellant and was not an ordinary, menial servant. When
the appellant was asked as to the duties of the appellee with
reference to the trimming of the trees, etc., he said: "He
was to do that, of course. I certainly would not have paid
him $60 a month for ordinary farm work, and he was repre-
sented to me by his father as being an expert on fruit. I
knew very little about the business, and hired him for that
purpose."

In reference to a servant's duty to refrain from insolent,
offensive and threatening words and behavior, it is said in 1

*Labalt's Master and Servant* (2nd Ed.), sec. 299, p. 930: "Every servant impliedly stipulates that both his words and his behavior in regard to his master and his master's family shall be respectful and free from insolence. A breach of this stipulation is unquestionably a valid reason for dismissing the servant, especially when it is accompanied by other conduct which would of itself justify a rescission of the contract. In order to justify his dismissal on this ground, it must be shown that what he said or did was incompatible with the continuance of the relationship. Previous provocation by the master will sometimes render excusable words or behavior which, apart from that element, would constitute a good ground of dismissal."

Many cases are cited in the notes to sustain the several rules announced in that section, and on page 932 it is said in reference to the provinces of Court and jury in determining whether a breach of duty has been committed: "As the various kinds of language and behavior which constitute a breach of the duty now under discussion are described by terms which are not susceptible of any precise legal definition, the question whether, in any given instance, a breach was committed, is essentially one of fact, and therefore primarily for the jury. In determining this question the nature of the occupation to which the given services had relation, and the social status and environment of the parties are material elements for consideration."

In 26 *Cyc.* 1016, the rule as to questions of law and fact is thus stated: "In general, in an action for wrongful discharge, as in other actions for breach of contract, questions of law are for the Court, while questions of fact or mixed questions of law and fact, are for the jury, under proper instructions by the Court. * * * What constitutes good and sufficient cause for the discharge of a servant is a question of law, and where the facts are undisputed, it is for the Court to say whether the discharge was justified. But where the facts are disputed, it is for the jury to say upon all the evidence whether

there were sufficient grounds to warrant the discharge." See also 20 *Am. & Eng. Ency. of Law,* 32; and in *Burroughs* v. *Langley,* 10 Md. 248, it was said that, "What constitutes good cause to justify a party in breaking his contract is for the Court to determine, and not the jury; matters set up in discharge are facts to be found by the jury, but their effect upon the contract is for the Court." In *Balto. City* v. *Schaub Bros.,* 96 Md. 534, it was held that the question whether the defendant's failure to perform its contract, if found as a fact, was sufficient in law to justify the plaintiffs in rescinding the contract on their part . In *Adams Express Co.* v. *Trego,* 35 Md. 47, at 64, JUDGE ALVEY said: "Whether there existed, as matter of fact, sufficient ground for the discharge of the appellee, was, of course, a question for the jury; but, as a principle of law, it may be stated generally, that the appellee, by the nature of his employment, was impliedly bound to serve the appellant faithfully, and to refrain from doing any act knowingly and wilfully which might affect injuriously the business of his employer." See also *Spencer* v. *Trafford,* 42 Md. 1, at page 20, where it was said, that the propositions in defendant's ninth prayer, which submitted to the jury to find whether the plaintiff violated his duty and so conducted himself that it would have been injurious to the interest of his employers to have kept him, were unobjectionable.

It is not altogether free from difficulty under these, and other authorities which might be cited, to draw the line between the province of the Court and that of the jury in cases of this character. There are cases where the acts of the servants are so flagrant and so manifestly contrary to the implied conditions arising from the relation of master and servant which should exist between them, that they can be decided by the Court as matters of law, but in a case involving alleged insolence, such as this, it would be almost impossible to lay down a general rule of law. If a servant without any provocation called his master a liar, especially

in the presence of other servants and concerning some deal-
ings between them, we could not hesitate to say that, "It
was incompatible with the continuance of the relationship,"
and declare as a matter of law that the master would be
justified in discharging him, but in a case such as this, the
Court was not authorized to instruct the jury that the defend-
ant was justified in discharging the plaintiff if the jury
found the facts in either of those prayers. In the first place,
it was perfectly natural for the appellee to believe his father
in preference to the appellant. His father had told him that
the appellant had agreed to pay the repairs, and the appellant
had paid for the hose without objection. As there was nearly
three times as much spraying done that season for the appel-
lant as there was for the appellee's father, and the sprayer
belonged to the father, it was not unreasonable to expect the
appellant to pay for the repairs. Then the inference from
the appellant's denial that he meant to say that the appellee's
father was telling an untruth, was as strong as that of the
appellee that the appellant was. What the appellee said
might well have been intended in vindication of his father's
veracity, and not with any intention to be insolent to the
appellant. The appellant apparently owed the appellee
$125.00, over two months' wages, on July 9th (at least that
is what he said he paid him on the 13th), although by the
contract the appellee was entitled to his money bi-monthly,
and he wanted money to pay the bill for repairs which he
had promised to pay the next day, although he was under no
obligation to pay for them, whether his father or the appel-
lant was correct in their understanding of the agreement
between them. He not only did not let him have the money,
but he flatly contradicted what the appellee told him his
father said. When then he made the remark to the appel-
lant, it can not be said it was made without considerable
provocation.

Then the meaning of his remark might depend very much
upon the manner in which it was uttered. So under all the

circumstances, we think the jury, and not the Court, should have determined whether the appellee was insolent to the appellant to such an extent that it was incompatible with the continuance of the relationship, and whether there was such provocation as would excuse his remark, but the Court should have instructed the jury as to what the law was upon their finding certain facts.  In 1 *Labbatt's Master and Servant,* sec. 272, on page 819, the author says: "By some authorities it has been laid down broadly that, when the facts have been ascertained, it is for the Court to say whether they import a breach of duty on the servant's part.  On the other hand, we find categorical statements to the effect that this question is always one for the jury.  But it will be apparent, from an examination of the decisions reviewed in the following sub-titles of this chapter, that neither of these doctrines can properly be said to be of universal applicability."  On page 823 of that volume it is said, "In any case where the sufficiency of the master's justification of a dismissal is deemed to raise an issue of fact, the proper course is to submit that issue to the jury under suitable instructions, informing them, in general language having relation to the evidence introduced, what kind of acts or omissions on the servant's part constitute a good cause for discharge."

So without further discussion of the subject, we are of opinion that both of the prayers of defendant were properly rejected.  Some of the questions submitted by them were improperly embraced in them because there was no legally sufficient evidence of them.  But if we disregard that defect we do not think that if the jury found all of the facts therein stated in favor of the defendant, the plaintiff would have been by reason of such finding disentitled to recover, and hence the judgment will be affirmed.

*Judgment affirmed, the appellant to pay the
costs.*