FREDERICK L. BREITINGER et al., Executors, et al. *v.* ELWOOD D. HEISLER.

[No. 50, January Term, 1928.]

*Decided April 13th, 1928.*

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*W. Calvin Chesnut* and *T. J. S. Waxter,* with whom was *Joshua Clayton* on the brief, for the appellants.

*Henry A. Warburton,* with whom was *James F. Evans* on the brief, for the appellee.

SLOAN, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court for Cecil County, awarding the appellee $3,853.78 against the personal estate, so far as applicable, and then against the real estate in Cecil County, of Henry P. Sauers, late of Philadelphia County, Pennsylvania, deceased, on a creditor's bill filed against the heirs, executors, devisees and legatees of Mr. Sauers.

The amended bill of complaint alleges that Henry P. Sauers was in his lifetime indebted to the appellee in the sum of $3,938.78; that he died on or about May 30th, 1926, leaving a last will and testament admitted to probate in the Orphans' Court of Philadelphia County, Pennsylvania; that his personal estate in Cecil County was of little value, insufficient to discharge his debts, and that he owned thirteen and one-half acres of land situte in Cecil County, which was a part of a larger tract of land conveyed to him in 1900. The bill then prays for a decree applying the personal estate to the payment of the debts of Henry P. Sauers; that an accounting

be taken under the direction of the court; and that the real estate, or so much thereof as may be necessary, be sold for the payment of so much of the debts due the appellee and other creditors as may be unsatisfied after the application of the personal estate thereto.

There was filed with the bill an account which the appellee claimed to be due him from the deceased, which is as follows:

"Estate of Henry P. Sauers, Deceased,
To Ellwood D. Heisler, Dr.

| | |
|---|---|
| To wages at $50 per month from December 22nd, 1919, to May 30th, 1926 | $3,863.28 |

September 1st, 1924,

| | |
|---|---|
| 35 gallons gasoline | 7.00 |
| 4 gallons cylinder oil | 3.00 |
| 5 gallons kerosene | .75 |
| 200 lbs. ice | 2.00 |

September 10th, 1924,

| | |
|---|---|
| 15 gallons gasoline | 3.00 |
| 200 lbs. ice | 2.00 |

September 24th, 1924,

| | |
|---|---|
| 20 gallons gasoline | 4.00 |
| 3 gallons cylinder oil | 2.25 |
| 5 gallons kerosene | .75 |
| 200 lbs. ice | 2.00 |

September 1st, 1925,

| | |
|---|---|
| 35 gallons gasoline | 7.00 |
| 4 gallons cylinder oil | 3.00 |
| 5 gallons kerosene | .75 |
| 200 lbs. ice | 2.00 |
| 3 years' rent of shanty | 36.00 |

$3,938.78"

With the bill was filed a certified copy of the will, wherein Frederick L. Breitinger, a lawyer of Philadelphia, Pennsylvania, and Catherine W. Sauers, wife of the decedent, were named as executors. The will indicates that Mr. Sauers was a man of considerable means.

It appears from the testimony that Henry P. Sauers had for about twenty years owned a farm in Cecil County, located

on the Northeast River, near Charlestown, on which there was a large dwelling house occupied by him during the summers, and on which farm there were several tenant houses, one of which was occupied by the appellee and his family for many years until all except thirteen and one-half acres of the farm, located on the Northeast River, had been sold by Mr. Sauers. During the years that he lived on the farm the appellee was in the employ of Mr. Sauers, and when employed exclusively by him was paid as wages eighty-five dollars per month. For two winters during the time the appellee lived on the farm he worked at Perry Point as a mechanic, and while so employed he was paid fifty dollars per month, and when through at Perry Point he returned to the farm of Mr. Sauers and resumed his full time employment at eighty-five dollars per month. This continued down to the 19th day of December, 1919, when the farm was sold, and the regular payment of wages to the appellee ceased. In January, 1920, the appellee left the farm, which no longer belonged to Mr. Sauers, and removed to Charlestown, where in 1921 he bought a house.

The appellee relies solely on the testimony of his wife and his twenty year old son as witnesses to the contract, which they allege was made by Mr. Sauers for the debt they now undertake to impress upon his estate. The testimony of the wife as to the alleged agreement to pay the appellee fifty dollars a month after the sale of the farm, and as to services rendered by him in consideration therefor, is as follows:

"* * * Then Mr. Lucas bought the place and we moved to Charlestown in January and the last time Mr. Sauers paid my husband the $50 was in December, 1919; he came down to the place to bid us goodbye before we moved from the farm to Charlestown; then he said, Pete, you take my boats and other things over to Charlestown and look after them over there for me, and I will pay you $50 a month the same as I have paid you over here. (6 Int.) Mrs. Heisler, did Mr. Sauers ever pay your husband $50 a month he promised him after you moved to Charlestown? (Ans.) No, we never had payments after we moved to Charlestown. (7 Int.) Did you or your husband ever ask him for a settlement? (Ans.) Yes,

sir; the first time that he asked was in 1925, when he came down to go rail birding and he told him he wasn't working at Perry Point now and we needed some extra money, so he said: 'Pete, I am going to pay your wages, I will attend to it.' The next time he came down to the club he came up to our place to see about getting ready to duck, and Pete spoke to him about it again, and than he said, 'Pete, I will pay you the next time I come down, as I was up late at the club last night, and will pay you the next time I come down. That was the last time that we saw him. The next time he came down to the club it was raining, and he didn't get up to see us, and we didn't know he was down there, so we didn't see him any more before he died. (8 Int.) What did your husband's duties consist of and what did he do for Mr. Sauers to earn the $50 a month? (Ans.) He tended to the boats through the winter and in the spring he put the boats overboard; he fished and he always sent him fish; he tended to the boats through the summer and the big boat was always ready for Mr. Sauers if he wanted to come down for a trip; in the fall he got ready for rail birding and he took him rail birding several times in the fall, and after that was over he got the boats ready for ducking; he painted all the decoys, painted and fixed the sink boxes, he ducked him during the fall and after ducking was over he put away the boats and the decoys and things for the winter."

The son, Elwood D. Heisler, Jr., testified that "During September and October in 1925, at our home, in Charlestown, father, mother, Mr. Sauers and I were present, * * * and father asked Mr. Sauers if he would pay his wages; that he wasn't working at Perry Point any longer and he needed the money, and Mr. Sauers told him that he would straighten it up." As to the second conversation he said, "Mr. Sauers was at our house and my father asked him again about the wages, and Mr. Sauers told him that he would pay him the next time he came down, and he never came down any more at our house. (Q.) Was there anything said in either conversation about what he was to pay your father? (Ans.) In the last conversation he said his wages were $50 a month."

The evidence is that the thirteen and one-half acres retained out of the farm by Mr. Sauers was for the purpose of providing a place for hunting, and from the time of the sale down to the time of his death the appellee, during the hunting season, looked after the boats, and after the season was over saw that they were put away. Then in the summer following he would get out the boats, paint them and put them in repair, ready for such use as Mr. Sauers had for them, and the appellee also used the boats himself. John Cooper, a witness, testified that the nature of the appellee's work was "taking care of the boats, keeping them in repair, painting them, taking him out in the yacht, out ducking and rail birding and fishing some," and that this had been going on for about six years. To the same effect Charles E. Norman testified.

It is evident that the services which the appellee rendered the decedent from the time of the sale of the farm in December, 1919, to his death in May, 1926, were only occasional or seasonal, and that he was not steadily employed by Mr. Sauers. From time to time it appears that certain settlements were made by Mr. Sauers with the appellee, as is evidenced by the checks which were paid by him to the appellee up to within two months of his last visit to Charlestown. The dates of the checks with their amounts and the notations on the respective stubs show settlements from April, 1921, as follows:

| "Date. | Amount. | Notation on Check Stub. |
| --- | --- | --- |
| Apr. 13, 1921 | $74.38 | Elwood D. Heisler—For what I owed him. |
| Dec. 12, 1921 | 187.88 | Elwood D. Heisler — For bills at Northeast and also boat bill and expenses and what he paid out for me in full to date. |
| Oct. 16, 1922 | 73.55 | E. D. Heisler—For rent and taking care of boat. |
| Dec. 15, 1922 | 30.25 | E. D. Heisler—For gas and rigging up for duck shooting, paint and licenses, etc. |

| | | |
|---|---|---|
| Oct. 15, 1923 | 148.00 | E. D. Heisler—For paint, license and work done for me extra, I paid him $148.00. |
| Dec. 22, 1923 | 25.25 | Heisler—For ducking outfit. |
| Mar. 1, 1924 | 35.00 | Elwood D. Heisler—Loan of $35.00. |
| June 2, 1924 | 50.00 | Heisler—Borrowed $50.00. |
| Aug. 28, 1925 | 49.40 | Elwood D. Heisler—For what I owed, $49.40." |

If there is anything which indicates the kind of employment or the understanding which Sauers and the appellee had after the sale of the farm and the removal of the appellee therefrom, it is these payments made from time to time, apparently in settlement of bills incurred and services rendered to the respective settlements.

The appellee's wife and son by their testimony show a contract, definite as to rate of wages, but indefinite as to time, and as to the measure and character of the services, and the wife, particularly, undertakes to prove a contract immediately after the sale of the farm by asserting that Sauers then said, "I will pay you fifty dollars a month the same as I paid you over here." Her testimony is that wages up to that time had been paid from time to time by check, either at fifty dollars or at eighty-five dollars a month, and then she testifies further that from that time on Sauers never paid her husband any monthly wages and it was never even mentioned by Sauers or her husband until in 1925.

As stated, the will indicates that Mr. Sauers was a man of considerable means and so far as we know, as well able to pay after the sale of the farm as he was before, and if he had had any intention or idea of paying the appellee his wages "the same as before", he would have remitted, as he had before, monthly by check. It might be said here, as in *Huff v. Simmers,* 114 Md. 548, 555:

"It has been held that the fact that the plaintiff, during the period when he might have enforced his claim by suit, if he had one, was in indigent circumstances and needed the use of the money, is a circumstance tending to justify the presumption that the demand has been paid or otherwise satisfied.

"In addition to this circumstance, affording a presumption of payment under the facts in this case, we have the further fact of the actual payment by his mother of substantial sums of money during the identical period embraced in the bill of particulars."

In addition to the settlements made from time to time, the appellee and the decedent had another transaction which indicates their relationship and the improbability of the agreement here set up. In 1921, the appellee bought a house in Charlestown, and asked Mr. Sauers to take a mortgage on it for $2,000 as part of the purchase money, and he loaned the appellee this amount at four and one-half per centum, and from that time he paid interest thereon, and in 1924 paid $100 on account of the principal. If the appellee's contention is correct, Mr. Sauers owed him $900 in wages at the time the mortgage was made, and $2,400 at the time he paid $100 on account of the principal. His excuse for paying the interest from time to time was that he got the bills from Mr. Breitinger, then the attorney and afterwards the executor of Mr. Sauers.

It looks very much as if the appellee had kept this claim in his own mind until, according to the testimony of his wife and son, he broached it to Mr. Sauers on the occasion of his last or next to the last visit to Charlestown, when the latter was a sick man. For seven months after that he failed to follow it up until his arrival at the residence of Mr. Sauers in Philadelphia the day that he died, when Mr. Heisler says he went there to get a settlement, though there is no evidence that the visit was made by any arrangement previously had with Mr. Sauers. It was testified by the wife that the appellee went to Philadelphia to see Mr. Sauers several times a year, and we cannot assume that this was not one of the usual visits. On the whole, the claim is not above suspicion. The circumstances under which the alleged demand was made in the fall of 1925 do not convince us that Mr. Sauers understood that a demand for more than $3,600 was being made upon him. In *Provident Trust Company v. Massey,* 146 Md. 34, a case the facts of which bear a strong similarity to the facts of this

one, this court, quoting from *Bagby's Maryland Law of Executors and Administrators,* 113, said: "When through a series of years the claimant's conduct was irreconcilable with his claim, it may not be allowed without clear and satisfactory proof from disinterested sources." Of the cases there cited, it was said: "There are many points of similarity between some of the cases above cited and the case now being considered, and in each of these cases the claimant was a member of the decedent's family, and that fact constitutes the vital distinction. If the parties are members of the same family the law presumes that at the time the services were rendered there was no intention to charge and pay for them and requires clear and satisfactory proof from disinterested sources to overcome this presumption. If the parties were not members of the same family there is no such presumption, but on the contrary there is an implied obligation on the part of the one who receives and is benefited by the services to pay their reasonable worth."

In the instant case the appellee does not undertake to recover on the *quantum meruit* for the "reasonable worth" of his services, but sets up a contract definite as to the amount of money involved, and undertakes to prove that contract without any variation, on the basis of $50 per month, regardless of the value of the services. If he stands on the contract, of course, it is well settled that he has no right to recover on the *quantum meruit.* There is either a contract at $50 a month or there is no contract at all upon which there can be a basis for recovery.

The burden in this case is on the appellee to support the allegations of his bill by clear and satisfactory proof. *Clark v. Clark,* 139 Md. 38, 44. And in *Thomas v. Frederick County School,* 7 G. & J. 369, 385, it is said: "The same deduction which a jury would be warranted to make this court is authorized to make when deciding a case without the intervention of that tribunal." It is inconceivable, if the appellee from month to month, over a period of more than six years, expected to receive from the appellants' decedent pay for his alleged services at the rate of $50 per

month, that he should have waited so long before asserting his rights. His circumstances were not such as to lead us to believe that he did not have need for the money long before his alleged demand. The last three checks given by Mr. Sauers to the appellee give color to the appellants' contention that there was no contract. He gave the appellee a check on March 31st, 1924, for $35 and noted on his check stub, "Loan of $35." On June 2nd, 1924, he gave the appellee a check for $50 and noted on the stub, "Heisler borrowed $50," and then on August 28th, 1925, he gave his last check which was for $49.40, and noted on the stub, "Elwood Heisler, for what I owe, $49.40," and the last check was within two months before his last visit to Charlestown. Of the checks for $35 and $50 Mrs. Heisler, in answer to the question, "Was it borrowed from him or not?" said, "No, we thought it could go on our wages." The notation on the checks show that all that was then in his mind was that he was making loans of the amounts and not paying $85 of a thirty-eight hundred dollar claim for wages.

Because we are of the opinion that the facts and circumstances in this case do not show with any degree of definiteness that there was an agreement between Henry P. Sauers and the appellee whereby the former was to pay the latter $50 a month from December 22nd, 1919, to the time of his death in May, 1926, and because the transactions had between Mr. Sauers and the appellee covering this period indicate that there was no such agreement, or at least that Mr. Sauers did not so understand it, the decree of the Circuit Court for Cecil County must be reversed.

*Decree reversed and bill dismissed, with costs to the appellants.*