ROBERT S. BRIGHT, EXECUTOR, *v.* PAUL GANAS

[No. 42, October Term, 1936.]

494

*Decided January 20th, 1937.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*V. Calvin Trice,* with whom were *Robert F. Duer* and *Q. C. Davis, Jr.,* on the brief, for the appellant.

W. *Laird Henry, Jr.*, and *George H. Myers*, with whom were *Henry & Henry* on the brief, for the appellee.

SLOAN, J., delivered the opinion of the Court.

The plaintiff, Paul Ganas, sued the defendant, Robert S. Bright, executor of James G. Darden, deceased, on an alleged testamentary contract for the sum of $20,000. The judgment being for the plaintiff for $8,990, the defendant appeals.

The first count of the declaration set up an oral agreement between the plaintiff and James G. Darden, entered into in the month of May, 1929, whereby the plaintiff was to live with Darden, at the latter's newly purchased home at Cambridge, Maryland, as a servant, and, in consideration of the plaintiff's so continuing with Darden during his lifetime, the plaintiff was to receive on Darden's death "out of his estate" the sum of $20,000; but that Darden died without having made provision for the plaintiff in his will (dated September 14th, 1931), which was admitted to probate and recorded in Dorchester County; that Darden accepted the services of the plaintiff, which were faithfully rendered, and so continued to November 18th, 1933, when Darden died. The second count was "for work done and materials furnished" at decedent's request. The defendant demurred to the first count of the declaration, and demanded a bill of particulars as to the second count. A bill of particulars having been filed, the defendant then demurred to the second count, and to the whole declaration, a suggestion for removal was made by the defendant, and the case removed to Somerset County, where the demurrers were all overruled, and the case tried. At the conclusion of the evidence, the trial judge granted a prayer for an instructed verdict for the defendant on the first count, so that the question of an agreement to devise or bequeath to the plaintiff has been treated by the defendant as no longer in issue on the appeal, and the plaintiff has not appealed, so that the right of recovery on the first count has been adjudicated against the plaintiff, and the only

question then on the pleadings is as to the legal sufficiency and effect of the second or common count.

The defendant's position seems to be that the common count in assumpsit is not available or is out of place in a suit on an express contract, and that it is only in order when recovery is sought on an implied contract, or one in which the only measure of damages would be on a *quantum meruit*. It has never been considered faulty pleading to include the common counts, when there is a count on an express contract. The practice in this state is to do both, or, as said in 1 *Poe, Pl. & Pr.* sec. 583: "In assumpsit a careful pleader, when declaring on a special contract, seldom omits the common counts." In *Bethlehem Steel Co. v. Dornberg,* 135 Md. 121, 108 A. 474, 475, a suit by a broker for commissions on a sale of real estate, it is said: "The first three counts in the declaration were the common counts in assumpsit, on an implied contract, while the fourth count sets out a specific contract; and it needs no citation of authorities for the proposition that a plaintiff cannot recover in the same suit upon both an implied and express contract." *Conservation Co. v. Stimpson,* 136 Md. 314, 110 A. 495; *Hamilton v. Thirston,* 93 Md. 213, 48 A. 709; *Gill v. Staylor,* 93 Md. 453, 49 A. 650; *Id.,* 97 Md. 665, 55 A. 398. It is well settled in this state, even if there is a special contract and the plaintiff has performed, he may declare on the common counts. *Walsh v. Jenvey,* 85 Md. 240, 36 A. 817, 38 A. 938; *Southern Bldg. Assn. v. Price,* 88 Md. 155, 41 A. 53; *Fairfax Forrest Mining & Mfg. Co. v. Chambers,* 75 Md. 604, 23 A. 1024; *Ellicott v. Turner & Peterson,* 4 Md. 476. The proper measure of damages in such case is the compensation fixed by the contract.

The defendant's contention is that the two counts are inconsistent, and they may be, but that cannot be determined until the evidence is in, and then the law must be applied by the instructions of the court to the facts in evidence. What was done in this case is the course usually pursued in the prosecution of suits for recovery of promised bequests and legacies in payment of alleged

services, the claimant fortifying himself, in the event of failure to establish a specific contract, by resorting to the *quantum meruit* under the common counts.) *Baker v. Lauterbach*, 68 Md. 64, 11 A. 703; *Ellicott v. Turner & Peterson*, 4 Md. 476. In *Hamilton v. Thirston*, 93 Md. 213, 48 A. 709, the plaintiff declared only on a specific oral agreement with an uncle for a devise in consideration of services. The statute of frauds was not pleaded, but defense was on that ground, was sustained in this court, and the judgment reversed with leave to the plaintiff to apply for a remand to so amend his pleadings as to declare in assumpsit for the value of his services. 1 *Woerner, Law of Administration* (3rd Ed.) p. 80, sec. 37; *Schutt v. Missionary Society*, 41 N. J. Eq. 115, 3 A. 398; *Clark v. Cordry*, 69 Mo. App. 6; *Schwab v. Pierro*, 43 Minn. 520, 46 N. W. 71; *In re Williams' Estate*, 106 Mich. 490, 64 N. W. 490; *Pelton v. Smith*, 50 Wash. 459, 97 p. 460. If the plaintiff established by evidence facts sufficient to show a contract to bequeath him a specific sum in consideration of his serving the decedent to the end of his days, unless sooner terminated by the act of either, then the plaintiff would be entitled to recover under the first count. If the evidence shows no contract, but an understanding that the services were being rendered on the implied agreement that they be paid for at their reasonable value, the second count, the sixth in *Roycroft v. Nellis*, 171 Md. 136, 188 A. 20, is sufficient in form for this purpose. The same count would also be proper in form if it should be found that there was an express contract, the work done, and nothing left but the payment of the money. *Walsh v. Jenvey, supra.* For the reasons which we have stated, the demurrers were properly overruled.

At the conclusion of the evidence, the plaintiff offered three prayers, the first and second of which were refused and the third granted, the special exception to which was overruled. The defendant offered ten prayers, of which the first and seventh were granted, and all others refused. The plaintiff specially excepted to the defend-

ant's eighth prayer, and the exception sustained, and the defendant's twenty-sixth and twenty-seventh exceptions are to the rulings on the prayers adverse to him. The defendant's first prayer, which was granted, was for a directed verdict on the first count of the declaration on the express contract. There were twenty-four exceptions to rulings on the evidence, of which six have been abandoned by the defendant, and thirteen have been treated by both sides as out of the case, by reason of the granting of the defendant's first prayer, though the plaintiff asserts that the evidence to which the thirteen exceptions applied remained in the case to be considered by the jury in so far as applicable to the second count. The evidence excepted to, pertaining to the first count, was admitted subject to exception. The defendant moved to strike it out, and he agreed, if the court granted his first prayer, it would not be necessary to pass on the motion to exclude the evidence. The trouble, as we see it, is that, being in the record, it cannot be ignored in the consideration of the other prayers for instructions, to the refusal of which exception was taken. The record shows without contradiction, on the plaintiff's proof, that he was entitled to a verdict for $20,000 or nothing; on the defendant's that he was hired at ten dollars a week, and that he could not recover anything more than the balance which might be due him at that rate. The fact that they disagreed as to the amount due would not make either contract the less express. See *Walsh v. Jenvey, supra.*

Paul Ganas, the plaintiff, a native of Greece, at the age of thirteen, came to this country about twenty-seven years ago, whither he had been preceded by his father, then engaged in the restaurant business at Roanoke, Virginia. He worked at various places, principally as a waiter, finally going to Washington, where he became acquainted with Colonel James G. Darden, a picturesque and mysterious character, who lived luxuriouly and seemed to be supplied with plenty of money, though we are not informed as to the nature or size of his estate. Colonel Darden settled in Cambridge in 1929, where he bought a

house, and in May of that year engaged Ganas as a servant or man of all work, more or less personal in its nature, and there Ganas continued until Darden's death in November, 1933, at about the age of sixty-eight. According to Ganas, he gave up a job as a waiter in a Washington hotel, which paid him from a hundred and fifty to two hundred dollars a month, to enter the employ of Darden, on the promise that he would receive out of Darden's estate, at the latter's death, twenty thousand dollars. He was not permitted to testify to this under the Evidence Act (Code, art. 35, sec. 3), and every time he disclosed the terms of his agreement it was, on motion, stricken out, except in two instances when it got in without objection. He had witnesses, however, who could and did testify to the agreement.

During his residence at Cambridge, Colonel Darden had in his employ as chauffeur and gardener Leonard Keene. Keene testified that he drove the colonel to Washington to get Ganas at the Haye Adams house in June, 1929, and of what happened on that occasion he said: "Well I went there and the Colonel was waiting for Paul. He was very much upset about it. He said, 'Paul, here you are late the first morning. Remember what I told you, promised you twenty thousand dolars.' Then on our way out, coming home (between Washington and Annapolis) he made the remark—said, 'Leonard, Paul is going to have a good home with me and get twenty thousand dollars at my death.' " He heard Colonel Darden make the $20,000 remark many times after that, but "most of the time he said he would be left well fixed." Colonel Darden made no secret of his arrangement with Ganas, but seemed to take delight in telling his friends in and around Cambridge that he intended to leave Ganas, as a reward for his services, the sum of $20,000. Five witnesses besides Keene testified that he had told them that Paul was to get $20,000 at the Colonel's death, and three others testified he had told them that when he died Paul "would be well fixed." Aside from the evidence of Keene, the other declarations, if communicated to the

plaintiff, could only leave in his mind the expectation of a legacy, which would not be sufficient to set up a testamentary contract. *Bantz v. Bantz*, 52 Md. 686, 695; *Krug v. Mills*, 159 Md. 670, 676, 152 A. 493. But the first statements to Keene were made in the presence and hearing of Ganas, and the other declarations made by the Colonel tend to corroborate his testimony, and in our opinion is legally sufficient evidence that the understanding between Colonel Darden and Ganas was that, in consideration of Ganas serving his employer so long as the latter lived, he was to receive $20,000 out of his estate, and this leads to the conclusion that the defendant's first prayer should have been refused and the jury allowed to say whether the plaintiff had earned and was entitled to a verdict for $20,000 on an express contract for that amount, unless the misconduct, disloyalty, and unfaithfulness, of which there was evidence in the record, disentitled him to recover.

The defendant offered evidence tending to show that the plaintiff was on a salary or was paid wages of ten dollars per week, and offered checks aggregating $4,446, of which seventeen had noted on the stubs, "$10 for Paul," and weekly wages for others, from which it was implied that the plaintiff was paid a weekly wage, and that this was all he could recover. The checks were usually cashed by the plaintiff, and paid over to Colonel Darden or distributed by him. Most of the checks were cashed by the plaintiff for his employer for the latter's personal use. One thing they did not show was a regular week by week payment of wages at ten dollars. There were other checks to him of varying amounts, and one to a tailor for "a suit of clothes for Paul." He testified that he did not get a regular wage—just enough for his personal needs, and scouted the idea that he was hired on a weekly or monthly basis. This agrees with Colonel Darden's understanding, as will appear from the evidence of Frederick F. Stevens of the Cambridge police court, who testified, "On one occasion he was telling me about what he paid Leonard, and I think he told me he paid seventy-

five dollars a month. I says, 'What do you pay Paul?' he said, 'I don't pay him anything.' I says, 'You mean to say he works for nothing.' He said, 'No, I give him fifty cents or a dollar, if he needs a suit of clothes I buy it for him. I don't pay him any salary at all. Paul is going to be well taken care of at my death. I have made arrangements that he shall get twenty thousand dollars,'" and this was repeated "at least a half dozen times when it was brought up in conversation." The suggestion that he was on a weekly wage was denied and repudiated by the plaintiff, so that he stands or falls on his alleged contract. All of which leads to the conclusion that there is nothing contained in the record which proves or tends to prove anything except a specific agreement for the payment of $20,000 out of Colonel James G. Darden's estate, at his death, to Paul Ganas, if he served the colonel faithfully and continuously to that time.

Colonel Darden was ill for several months continuously to the day of his death. So far as he knew, during that time, the plaintiff was serving him faithfully, and assisted in nursing him. On or about the last day of August, 1933, Mrs. Darden had left her husband's room late at night (the plaintiff was downstairs at the time), and had gone to her room, where she there found on her bed an envelope containing a letter addressed to her by the plaintiff. It would serve no worthy purpose to quote it or to even summarize its contents, except to say that this plaintiff had designs on his employer's wife, which he was intent on revealing to her. She testified that the next morning she took the letter to her mother, who lived in Cambridge, asked her to read it, and asked her advice. She told Dr. Wolfe, her husband's physician (since deceased), about it, and he advised her against telling her husband. She said, "I wanted to that night, but I knew he could not stand it." Asked on cross-examination, "You spoke of locking your door after the burial. There was never any effort on Paul's part to follow this up was there?" she answered, "He did not have a chance. I had some one near me all the time." About two hours after

Colonel Darden's funeral she showed Mr. Bright, the executor, the letter, and told him the plaintiff must get out of the house. He being told by Mr. Bright that he must leave, he rebelled, and the next day he was told by his attorney he had to go, and then did.

The plaintiff must have had some conception of the gravity and consequences of his offense, for on the envelope containing the letter he wrote: "If I lose my job by this note—at least I would gain my peace of mind—." When asked at the trial what led him to write the letter, he gave a long, incoherent, unresponsive answer, which showed no reason or excuse for writing it, and that it was inspired by moral depravity, or a disordered, disorderly, mind, with no conception of the proprieties, especially when his employer, who seemed to be fond of him, and whose confidence was thus betrayed, was so ill that his physician forbade any communication with him on the subject. This record discloses no excuse or justification for the plaintiff's behavior. He is the one who offended against all the rules of propriety and decency, and he ought to pay the penalty instead of reaping a reward. There was nothing in the wife's conduct inviting such an outburst from the plaintiff. If this act of the plaintiff was such as to justify his immediate and summary discharge, if his employer had known of the incident, then, in our opinion, it is as available to the executor as a defense, as it would have been to the decedent in his lifetime. In *Dorrance v. Hoopes,* 122 Md. 344, 349, 90 A. 92, 94, the general rule as there stated is, "that, although there is an agreement employing a servant for a definite period, he may be discharged by the master before the expiration of that period for sufficient cause." In the opinion in that case this quotation from *Wood on Master and Servant,* sec. 109, p. 210, peculiarly applicable to the facts of the instant case, appears: "Mere misconduct, not amounting to insubordination, or involving moral turpitude, or exerting a bad influence over other servants, or producing injury to the master's business, or members of the master's family, is not enough to warrant the

discharge of a servant. The misconduct must be gross, or such as is incompatible with the relation, pernicious in its influence, or injurious to the master's business; and, in determining the question, reference must always be had to the business or employment in which it arose, and the relative social condition of the master and servant." And this from *Labatt's Master and Servant* (2nd Ed.) sec. 299, p. 930: "Every servant impliedly stipulates that both his words and his behavior in regard to his master and his master's family shall be respectful and free from insolence. A breach of this stipulation is unquestionably a valid reason for dismissing the servant, especially when it is accompanied by other conduct which would of itself justify a rescission of the contract."

As we have indicated, this is one entire contract, and the plaintiff was entitled to the full consideration of his contract or none of it. *Schneider v. Hagerstown Brewing Co.*, 136 Md. 151, 154, 110 A. 218; 39 *C. J.* 145, 149. On the theory of an entire contract, if the act of unfaithfulness and disloyalty here charged against the plaintiff was sufficient to warrant his immediate discharge by his employer, had it been known to him, then his right to compensation has been forfeited (20 *A. & E. Ency. Law* [2nd Ed.] 20), for it cannot be assumed that the employer would not have done the thing that common decency and loyalty to his wife would have required him to do. The question for us then is, whether it is one of law for the court or of fact for the jury, the legal sufficiency of the evidence to support a verdict for the plaintiff having been submitted by the fourth prayer of the defendant for a directed verdict, which was refused and exception taken. If held to be for the jury, then the defendant's sixth and ninth prayers, which instructed the jury to find for the defendant if they found the plaintiff to have been unfaithful to his employer, should have been granted.

The rule with respect to the province of the court and jury as stated in 26 *C. J.* 1016, and quoted in *Dorrance v. Hoopes, supra,* is: "What constitutes good and sufficient cause for the discharge of a servant is a question of law,

and where the facts are undisputed, it is for the court to say whether the discharge was justified. But where the facts are disputed, it is for the jury to say upon all the evidence whether there were sufficient grounds to warrant the discharge," and in that case (122 Md. 344, at page 352, 90 A. 92, 95) this court said: "There are cases * * * so flagrant and so manifestly contrary to the implied conditions arising from * * * master and servant which should exist between them that they can be decided by the court as matters of law." 39 C. J. 212.

In this case the violation of the agreement by the plaintiff was so flagrant, unjustified, and inexcusable as to justify his discharge, and, if by it he earned his discharge, then he cannot recover. It was not contradicted, denied, nor even explained, so that, in accordance with the rule herein stated, in our opinion the plaintiff was not entitled to recover, and the defendant's fourth prayer should have been granted. 13 C. J. 790, sec. 1011.

The plaintiff, having shown without contradiction an express contract, he was not entitled to recover on a *quantum meruit* under the second count as the jury was instructed it might do under the only prayer, the third, granted the plaintiff. *Jenkins v. Long,* 8 Md. 132; *Olmstead v. Bach,* 78 Md. 132, 27 A. 501; *Breitinger v. Heisler,* 155 Md. 157, 165, 141 A. 538; 1 *Poe, Pl. & Pr.,* sec. 91.

There was another matter mentioned in the evidence of which some notice should be taken, and that is a claim of one thousand dollars against the estate in favor of the plaintiff. When Mr. Bright went to Cambridge after Colonel Darden died, he told the plaintiff that a few days before the Colonel's death he told Mr. Bright that he should pay to Paul Ganas and Leonard Keene a thousand dollars each. He testified: "I don't know whether it binds me in law; I can only tell the court what he said should be done; whether it is a good will, whether the court will allow you the thousand dollars I don't know; it isn't written; he was too sick to write it. In fact I asked him to write it. He said, 'I have told you.' I did not press it. He was dying. He was dying for a week or ten days."

The executor then paid the plaintiff, at his request, a hundred dollars on account and took a receipt for the payment, saying he would "take a chance." The court refused an instruction at the defendant's request that the thousand dollars "was not subject to recovery in this suit." The record clearly shows that this item was not involved in this suit, and was so treated at the trial.

*Judgment reversed without a new trial, with costs to the appellant.*