Emanuel M. Boock, Appellee, v. L. O. Napier and M. A. Napier, Individually, and L. O. Napier, Trading as The United Reserve Insurance Agency and L. O. Napier and Madeline Napier, Trading as L & M Agency, Appellants.

Gen. No. 46,318.

Opinion filed June 9, 1954. Rehearing denied June 29, 1954. Released for publication June 29, 1954.

BRUNDAGE & SHORT, of Chicago, for appellants; CHARLES F. SHORT, JR., and P. SVEINBJORN JOHNSON, both of Chicago, of counsel.

MICHAEL A. GERRARD, of Chicago, for appellee.

MR. PRESIDING JUSTICE NIEMEYER delivered the opinion of the court.

Defendants appeal from a decree directing an accounting as to commissions, if any, due plaintiff as sales manager of insurance agencies under a contract dated February 12, 1946 between the plaintiff and defendant L. O. Napier, doing business as The United Reserve Insurance Agency, and a contract dated May 1, 1947 between plaintiff and defendants doing business as the L and M Agency.

By the first contract plaintiff was employed to manage and promote the sale of life, health and accident, hospital and other insurance in certain territories where The United Reserve Insurance Agency may be doing business. As such sales manager plaintiff was to find, train and supervise agents and solicitors for his employer (hereinafter referred to as Napier), and to do everything in his power under the direction of Napier to promote the sale of such insurance in the territory defined in the various agreements between Napier and the several companies for which he was writing insurance, namely The United Insurance Company of Chicago, Reserve Life Insurance Company of Dallas, Texas, Colonial Life and Accident Company of Chicago, and National Travelers Casualty Company

21

of Des Moines, Iowa. Plaintiff's compensation was fixed at $150 per week as salary, and a sum equal to 2 per cent of the net cash premiums received by the insurance companies hereinabove named, whether said payments were paid directly to the company or paid to the agency. This compensation was to be paid to plaintiff in the month succeeding the payment of such premiums to the respective companies. The term "net cash premiums" is defined as "the cash premiums actually collected on business written by said United Reserve Insurance Agency, exclusive of amounts retained by solicitors or agents in the employ of said agency, and includes all such premiums which are paid in respect of policies written by said agency during the term of Boock's employment." The contract could be terminated by either party upon serving written notice upon the other party 60 days in advance of the date of termination. On termination of the contract the commissions payable to Boock thereunder shall continue to be paid "in respect of all business placed on the books by United Reserve Insurance Agency during the employment of Boock so long as premiums are paid on said business and so long as Boock does not employ, use or tamper with any of the personnel, including agents, managers and solicitors of said United Reserve Insurance Agency, unless with the written consent of Napier."

The second contract, dated May 1, 1947, was between plaintiff and the defendants L. O. Napier and M. A. Napier, co-partners, doing business as L and M Agency. Defendants are husband and wife. The partnership represented the American Life Insurance Company of Chicago. Plaintiff's duties as sales manager were identical with those fixed in the contract with Napier. He drew no salary, his compensation was limited to a sum equal to 2 per cent of the net cash premiums received by the insurance company directly

or through the agency. The agreement could be terminated by either party upon giving 60 days' notice to the other party, and plaintiff's right to future payments of commissions was identical with his rights under the first contract.

Plaintiff began the performance of his duties under the contracts on their respective dates and continued until he terminated his employment under each contract as of November 1, 1949, by notice dated August 30, 1949. Under the contract with Napier he opened a number of offices in various states, appointed managers of the offices and employed or directed the employment of many solicitors or salesmen. About 200,000 policies were sold. Services performed under the L and M Agency contract were of a like nature, but the business procured was considerably less. Plaintiff's salary was paid regularly and he was reimbursed for his expenses. At various times he received payments on account of commissions due him, but the provisions of the contract as to monthly payments of such commissions and the furnishing of copies of monthly statements received from the insurance companies were not complied with. In May of 1950 defendants, acting on advice of counsel, advised plaintiff that no further payments of commissions would be made. Suit was then brought. The cause was heard before a master, whose report was approved by the court and the decree for an accounting, hereinbefore mentioned, was entered.

■ The testimony of plaintiff as to work done in promoting sales of insurance is undisputed. There is no evidence of complaint or cause for complaint in this respect. On the contrary, plaintiff testified without contradiction that Napier tried to induce him to change his mind about termination of his employment and to continue working under the contracts. The only charge of breach of contract barring plaintiff's right to further commissions is defendants' claim that plaintiff

23

was disloyal in that he systematically maligned his employer by telling various office managers employed by defendants that Napier, the active head of the agencies, was incompetent, crazy, insane and did not know what he was doing; that all Napier had was money, and he, plaintiff, was the brains of the organization; that defendants could not run the business without plaintiff; that the organization would collapse if he left it and that the managers were to pay no attention to instructions received from defendants. In support of this contention defendants introduced the testimony of seven former office managers, three other employees and the wife of an employee as to conversations at various times, to and including a Christmas party in 1948, in which the respective witnesses claim that plaintiff made one or more statements like those hereinabove enumerated derogatory to Napier. A contract printer whom plaintiff had known for years testified that in September or October 1949 plaintiff told the witness that he, the plaintiff, was leaving and that it would be wise for the witness to collect the money Napier owed him as he, plaintiff, was not sure that the organization would fare so well after he left. The master rejected the testimony of the manager of the building in which defendants' offices were located and a barber in the building concerning an alleged statement of plaintiff that Napier was incapable of managing the insurance business of which plaintiff was carrying the burden, and that Napier was mentally sick and should be placed in an institution. No ruling of the trial court on this action of the master was sought in the manner and at the time fixed by the rules of the superior court. The defendants' objection is waived. Plaintiff unequivocally denied making any of the statements testified to by these witnesses. Neither defendant testified and there is no testimony in the record as to when defendants first learned that

24

plaintiff was making derogatory statements as to either of them. Defendants' counsel state in the brief that the defendants did not learn of such statements until May 1950, when counsel advised defendants to make no further payments of commissions. This statement of counsel is not evidence.

The rule of law on which defendants rely is stated in *Breen v. Larson College,* 137 Conn. 152 (the first case cited by them), as follows: "that in contracts of hiring there is an implied condition that the servant will perform the duties incident to his employment honestly, and will do nothing injurious to his employer's interest, and if he proves radically unfaithful to his trust or is guilty of gross misconduct he forfeits all right to compensation." In that case plaintiff, employed as academic dean of the college, was discharged for statements "without basis in fact" made in letters to the mothers of two students derogatory of the president and vice-president of the college. The court said:

"It (one of the letters) was not written in the best interests of the defendant but was calculated to and was wilfully written with intent to injure it. The plaintiff failed to perform the duties of his employment in accordance with his obligation, he did not serve the defendant faithfully and honestly, and his conduct was injurious to its best interest."

Defendants also cite *Osburn v. DeForce,* 122 Ore. 360, 374–375, in which plaintiff brought suit for damages resulting from his discharge as manager of the DeForce Oil Works, owned by defendants. Prior to the institution of this suit plaintiff had brought a suit in equity to restrain defendants therein from interfering with plaintiff's management of the oil works, alleging "that said defendants and both of them are incapable of adequately or efficiently attending to the affairs and business details of the DeForce Oil Works."

25

A temporary injunction was dissolved upon a hearing. Thereafter plaintiff was discharged. In the action for damages defendants asserted that plaintiff's prosecution of the suit for injunction was sufficient cause for discharge. The court held that plaintiff breached his contract expressly and impliedly by instituting the suit in equity publicly charging his employers with incompetency, and said:

"The making of this complaint and publishing it to the world as plaintiff did was calculated to injure defendants' business. Plaintiff was the employee of the defendants' intestate and his wife. The charges plaintiff made against them displayed a lack of fidelity to their business and disloyalty to them. Plaintiff had expressly contracted to do his utmost to build up his employers' business. Every contract of employment implies an engagement on the part of the employee to be faithful to his employers' interests and loyal to his employers. The charges made by plaintiff against his employers are the opposite of his implied contract with them."

The cases of *Myers v. American Well Works,* 114 F.2d 252, and *Bright v. Ganas,* 171 Md. 493, cited by defendants, have no particular application to the case before us.

The master made no specific finding as to whether plaintiff made the statements attributed to him by the various witnesses testifying for defendants. He considers the testimony as being of little, if any, weight and ignores it in his final conclusions and recommendations. In the case of *Breen v. Larson College* the derogatory statements on which plaintiff's discharge was based are said by the court to be "without basis in fact," and the disloyalty of the employee (to use defendants' phrase) to justify dismissal was stated to be radical unfaithfulness or gross misconduct. In

26

*Osburn v. DeForce* the allegations of incompetency and inefficiency were made in an action proved to be unfounded and amounted to a disclosure to the public at large of the alleged frailties of the defendants. If we assume plaintiff made the statements attributed to him, they were made to persons within the organization in office gossip or discussion of the work for which plaintiff and his listeners were employed. The wife of the employee, who testified for defendants, was in effect an eavesdropper sitting outside the closed office in which plaintiff was talking with her husband. There is nothing to indicate that the reference to Napier as crazy, etc., was made by plaintiff or accepted by his listeners in a strict technical sense. It may have been and probably was loose talk to minimize Napier's connection with the business and to emphasize, if not to exaggerate, plaintiff's part in it. Such self-praise by a salesman in a conversation with another is not uncommon and is seldom taken at face value. The employees, and especially the managers, had a general knowledge of the respective parts taken by Napier and plaintiff in the conduct of the business. There is nothing in the evidence to indicate that plaintiff's talks had any injurious effects upon the morale of the employees or the functioning of the organization. There is no evidence tending to show a willful intent on the part of plaintiff to produce such injurious effects. Only one witness testified to an act by plaintiff counteracting or overruling Napier's decision, and this was in respect to a minor matter. It is true, as contended by defendants, that injurious effects of an employee's breach of contract need not be shown, "as the misconduct of the agent affects the contract from considerations of public policy rather than of injury to the principal." *Steinmetz v. Kern,* 375 Ill. 616, 621. Plaintiff was industrious and capable in promoting the business of defendants. The United Reserve Insurance

27

Agency wrote approximately 200,000 policies during his employment. That the defendants were satisfied with his services and the results produced is evidenced by the efforts of Napier to induce plaintiff to continue under the contracts. As hereinbefore stated, there is no evidence that defendants did not know of the alleged statements of plaintiff now complained of until May 1950. The burden of showing that fact, if it be a fact, was upon defendants. The evidence does not bring plaintiff's conduct within the rule of the cases cited. His unfaithfulness, if any, was not radical. His misconduct, if any, was not gross. There is no evidence that plaintiff employed, used or tampered with any personnel, including agents, managers or solicitors of either of the agencies operated by defendants. He is entitled to the commissions claimed.

██ Plaintiff testified without contradiction that after the execution of the contract of February 12, 1946, the defendant Napier procured the Agency of The Guaranty Life Insurance Company of Hammond, Indiana, Security National Life of Missouri, and the Colonial Insurance Company of Toledo, Ohio; that plaintiff worked with Napier in procuring the agency for these companies, and under the contract of February 12, 1946 opened offices, appointed managers and employed agents and solicitors to sell the insurance of the companies. The testimony supports the finding of the master that plaintiff is entitled to an accounting as to commissions on the business and policies obtained by defendants for these companies.

 Defendants further contend that equity does not have jurisdiction of plaintiff's claim. No Illinois case is cited in support of this contention. Reliance is placed upon the case of *Ball v. Harrison*, 314 Mass. 390, which holds, in harmony with the cases of this jurisdiction, that a suit in equity for accounting is proper

28

where "the account is so complicated that it cannot conveniently be taken in an action at law." This contention is without merit.

The decree is affirmed.

*Affirmed.*

Burke and Friend, JJ., concur.