[No. 30037. Department One. September 16, 1947.]

ROLLAND HAAG, *Appellant,* v. JESSIE REVELL, *Respondent.*[1]

*J. P. Tonkoff* and *Elery A. Van Diest,* for appellant.

*Harcourt M. Taylor,* for respondent.

[1] Reported in 184 P. (2d) 442.

ROBINSON, J.—This is an action for breach of contract and an accounting. Jessie Revell, the defendant below, owned a twenty-acre tract of land in Yakima county, Washington, of which about seventeen acres were devoted to the raising of fruit.

The plaintiff, Rolland Haag, alleged that, in October, 1944, Mrs. Revell employed him, by oral contract, for a period beginning November 1, 1944, and ending November 1, 1945, to care for and maintain the orchards, agreeing that he would be furnished a dwelling on the premises for himself and family, receive the sum of one hundred dollars per month, and, after the harvest and sale of the fruit, ten per cent of the net proceeds. He alleged that he performed all of the appropriate and necessary duties of his service until May 6, 1945, on which date he claimed to have been discharged without cause.

He further alleged that he had good grounds to believe that the gross receipts for the crop of pears for the 1945 season was fifteen thousand dollars, peaches, seven hundred fifty dollars, cherries, one hundred fifty dollars, and that, in addition to these crops, the defendant harvested approximately fifty tons of prunes and a large quantity of plums. He further alleged, on information and belief, that the defendant was indebted to him in excess of two thousand dollars, and prayed that an accounting be ordered, and that judgment be entered in his favor for the amount therein determined.

The defendant, answering, admitted the making of a contract, and that she discharged the plaintiff, as alleged, but denied the allegation that she did so without cause. She also set up, in an affirmative paragraph, that plaintiff neglected to perform his agreement, in that he failed to prune the orchard in the winter season when she was absent in California, making it necessary for her to have the work done by others, and, during her absence, she sent the plaintiff three hundred dollars to be used in getting the pruning done, only a portion of which he expended for that purpose.

The defendant also cross-complained, alleging that, at plaintiff's request, in January, 1945, she loaned the plaintiff three hundred forty dollars for the purpose of making a final payment on his car, and it was agreed that, for her security, he would take title to the car in her name and further permit her to retain twenty-five dollars per month out of his salary until the debt was discharged. Out of this amount, seventy-five dollars had been so collected, leaving the plaintiff owing her two hundred sixty-five dollars, for which she prayed judgment and a lien on the car for that amount.

The case was tried by the court. Two arguments were heard on the matter. At the second argument, defendant's attorney announced his client's willingness to dismiss her cross-complaint. The court then ordered the dismissal of the plaintiff's action, and it is from that disposition of the matter that plaintiff appeals.

It would be of no profit or use to anyone to enter into a detailed discussion of the evidence in this case. It may be said, however, that the defendant had a large fourteen-room house on the premises, of such construction as to lend itself to dual occupancy. The defendant retained one half of the house for her own use; the plaintiff, his wife, and their small son occupied the other half. She furnished the plaintiff money with which to buy a cow and, upon leaving in the late fall for a visit to California, signed checks in blank for his use in purchasing supplies needed for the operation of the orchards, for his wages, and other necessary purposes.

There is quite persuasive evidence that he spent a great deal of the time in a nearby coffee house which should have been spent in pruning the orchards. Learning that the trees were not being pruned, the defendant wired the plaintiff three hundred dollars to hire pruners to attend to the job. Returning to her home in January, she found that the work had not yet been done and furnished additional sums for that purpose, in all, six hundred dollars, but she did not then and there discharge the plaintiff, and on that account the trial court seems to have seriously

entertained the idea that the plaintiff's dereliction in that respect could be held to have been condoned.

Mrs. Revell testified that, after the pruning was done, there was a dangerous and unwarranted delay in attending to the calyx spraying, and that they were getting so behind in the general work of the orchards that she had to complain about it. She testified:

"Yes, I often mentioned to him that if we didn't hurry up and step on it we would not be through in time to pick."

However, the immediate cause of the plaintiff's discharge was of an entirely different nature. Mrs. Revell was attending a neighborhood party. Some wax was needed for the floor. She offered to go home and get the wax if someone would furnish the transportation. A Mrs. Basel did so. When they got to her home, plaintiff's car was standing in the driveway. It was dark, and Mrs. Revell did not know that plaintiff was standing on the porch and within hearing. We quote the defendant's testimony as to this incident:

"A. She [Mrs. Basel] said, 'How are we going to get around this here car?' I said, 'Oh, go around on the grass there.' I said, 'Everybody else does, it sits in the front of his door most of the time.' I said, 'There's a garage out there, but it's seldom ever in it.' She says, 'Well, we'll just shove it on out in the orchard.' I said, 'Oh, no, don't do that.' Right then he yelled out and he said, 'I would just like to see you do anything with that car.' So, I said to Bertha, 'Come on, let's get out of here, he isn't in very good tune,' and we just drove on out of the yard. Q. Is that all he said? A. Well, he swore some with it, because he wasn't in the right mood at that time to talk very pleasant. . . . That was Saturday night. Sunday morning I went off to church and came back and I didn't see them all day long. Monday morning I thought, well, it's about time now I seen that calyx spray get on, and I went in there and Roland was sitting in the corner, kind of grouchy-looking, and his wife was building the fire, and I said, 'Well, Roland, did you see Louie? Is he going to come over and help us spray?' and I thought he said, 'I suppose so'; and we sat down and she had the fire built and we sat down and was going to eat our breakfast, and then he said to me, he said, 'Why didn't you finish up that with Bertha out there about

why I didn't have my car in the garage?' and I said, 'Well, why don't you have your car in the garage?' He said, 'Well, I can tell you the reason why I don't have my car in the garage'; he said, 'You got that God-dam barrel of gas sitting there and I can't get in and open my door'; and I said, 'Well, that can be moved,' and he said, well, it wasn't up to him to move it, and I said, well,—then he said to me, he said, 'It seems like to me you've been atrying to stir up something here for a month or more because I'm not doing what you think I ought to do'; and I said, 'No, Roland, I'm not,' I said, 'but,' I said, 'we've got to get in and get things done, and, Roland,' I said, 'if I hadn't wanted you to come here, do you suppose that I would buy a cow, just me a lone woman, buy a cow to take care of just to get a little milk and butter?' I said, 'I bought that cow for you,' and he said—and his wife spoke up and says, 'No, you didn't buy that cow for us.' I said, 'Well, Roberta, who, then, did I buy that cow for if I didn't buy it for you?' And there was several other things said, I don't remember just exactly word for word, but in the end she called me a liar, and I said, 'Well, now we're all through'; I said, 'I've taken all I'm going to take,' and I said, 'the sooner you can get your stuff and get them in a truck and get them out of here, the better I will like it.' There wasn't a thing said about the week's wages that I owed him or the money that he had of mine."

It may be interpolated at this point that the evidence is that the plaintiff's wife was a skilled and efficient orchard worker. As we understand the evidence, the defendant paid her one hundred dollars for work done prior to November 1st, when her husband's contract began, and $206.10 for work done after defendant returned from California. This later amount was for such work as pruning and driving a tractor during the spraying season.

At the conclusion of the evidence, it was apparent that, when the appellant was discharged, he still had in his possession ninety-one dollars of the three hundred dollars which Mrs. Revell had wired him to employ pruners, and owed her two hundred sixty-five dollars of the three hundred forty dollars loaned him to pay for his automobile. On the other side of the ledger, it appears that, sometime during the performance of the contract, Mrs. Revell bought

a pig for seven dollars, which plaintiff was to feed, and ultimately each was to have a half interest therein. Soon after the Haags left the premises, Mrs. Revell had the pig butchered, and testified that she notified Haag that he could have his half, and he refused it, on the ground that he had no place to keep it. He pleaded that Mrs. Revell owed him fifty dollars as to this transaction.

At the conclusion of the evidence, the trial judge heard oral argument. At the close of that argument, he announced that he would defer his decision in order to consider certain legal aspects of the case. Subsequently, the court, by a letter, called for reargument, stating, in part, as follows:

"The court desires counsel to elaborate upon the right of a master to discharge a servant for disrespect, and also to comment on the law of condonation and waiver."

Counsel for both parties presented argument along these lines. A considerable portion thereof is included, and certified to, in the statement of facts. About two weeks after hearing counsel, the trial court filed the following memorandum decision:

"It is the general rule that an employee owes to the employer respectful and decorous treatment, and unprovoked insolence and disrespect for him or his representative will justify his discharge. 35 Am. Jur., p. 480, Sec. 48.

"Even though one's services are engaged by another for a definite term, the employer may discharge him for good cause, during the term of employment, without incurring liability for breach of contract. 35 Am. Jur., p. 470, Sec. 36.

"In the instant case, the evidence is undisputed that, while discussing business matters at the breakfast table, the plaintiff without protest permitted his wife to declare the defendant a liar, and the evidence is also undisputed that a short time prior to this incident he used profane language in addressing his employer, the defendant herein.

"Plaintiff's complaint will be dismissed. The cross-complaint will also be dismissed."

Appellant prays for reversal upon several grounds. It is urged that the ground of discharge which the court found valid was not pleaded. However, no objection was

made to the introduction of the evidence which tended to establish that ground. If objection had been made, we think it would have been rightly overruled. Plaintiff alleged that he was discharged "without cause." The defendant categorically denied that allegation and, therefore, had the right to introduce evidence that there was a cause. A broad field was opened by the plaintiff's allegation that he was discharged without cause.

It is said in 35 Am. Jur. 471, § 37:

"It is not necessary that an employer, in order to justify a dismissal, show that in dismissing his employee he in fact acted upon some proper ground of dismissal. It is sufficient if a ground of dismissal existed at that time. It is not material whether the employer knew of grounds which in fact existed at the time of discharge; notwithstanding his ignorance, he may avail himself thereof, and in the event of his death, his representative has the same right. *Nor is it material that the employer assigned another ground as the cause of the employee's dismissal. The employer may justify a dismissal by relying on a ground different from that assigned at the time of the dismissal."* (Italics ours.)

The trial court, in its memorandum opinion, relied upon certain sections of the article on Master and Servant in 35 Am. Jur., a limited portion of which we quote:

"Unprovoked insolence or disrespect on the part of the employee toward the employer or the latter's representative may afford ground for the discharge or dismissal of the employee prior to the conclusion of the term of employment." 35 Am. Jur. 480, § 48.

"Even though one's services are engaged by another for a definite term, the employer may discharge him for good cause during the term of the employment without incurring liability for breach of contract. This is true even where the contract of employment stipulates that the employee shall be retained in the service during the term of his life." 35 Am. Jur. 470, § 36.

Appellant relies largely upon the case of *McIntosh v. Abbot,* 231 Mass. 180, 120 N. E. 383. The case of *Dorrance v. Hoopes,* 122 Md. 344, 90 Atl. 92, Ann. Cas. 1916A, 1012, is even closer to the instant case in its facts.

The law governing discharge for insolence is well-settled. The real value of the cases just cited is that they demonstrate that every case of this kind must be decided upon its own facts.

 We do not find anything ·in the evidence that would warrant us in reversing the trial court. In our opinion, we would be compelled to affirm the order of dismissal herein appealed from if it had been based upon the grounds of the plaintiff's neglect of his work and his erratic handling and accounting for the funds furnished him. Since the case is here *de novo,* we are entitled to consider these grounds.

We are of the opinion that the condonation rule is inapplicable. It seems to us that the discharge was the result of a series of incidents occurring within a comparatively short time, of which the insolent and disrespectful attitude of the plaintiff, at the time he was discharged, was the proverbial "last straw." It is not disputed that, early in the progress of the quarrel, he said:

"It seems like to me you've been atrying to stir up something here for a month or more because I'm not doing what you think I ought to do."

That is not consistent with condonation.

It is said in 1 Labatt's Master & Servant (2d ed.) 606-607, § 190:

"So also, where the cause of discharge relied upon is incompetency, manifesting itself in repeated acts, the employer is not obliged to take advantage of the first infraction of the contract. A different doctrine would involve the consequence that 'anything forgiven might fasten the contract upon him, and make the incompetent workman secure in his employment.'·"

The order appealed from is affirmed.

MALLERY, C. J., MILLARD, JEFFERS, and SCHWELLENBACH, JJ., concur.