661 A.2d 202

Steven A. SHAPIRO

v.

Alan D. MASSENGILL, et al.

No. 999, Sept. Term, 1994.

Court of Special Appeals of Maryland.

July 6, 1995.

744

746

748

Julian S. Greenspun (Michael J. Dixon and Storch & Brenner, on the brief), Washington, DC, for appellant.

Richard E. Schimel (Budow and Noble, P.C., on the brief), Bethesda, for appellees.

Argued before WILNER, C.J., and MOYLAN and HOLLANDER, JJ.

HOLLANDER, Judge.

"An eminent lawyer cannot be a dishonest man," Daniel Webster once said.[1] This thought underlies the employment dispute between two attorneys—one who fired an associate out of distrust for his integrity and his judgment, and the other who claims he was defamed and wrongly discharged. Appellant Steven A. Shapiro was terminated from employment by appellees Alan D. Massengill and Alan D. Massengill, P.A. because, during employment negotiations, Shapiro did not

---

1. Address to Charleston, S.C. Bar, May 10, 1847. Quoted from DAVID S. SHRAGER & ELIZABETH FROST, THE QUOTABLE LAWYER ¶ 75.67, at 188 (1986).

inform Massengill that his former employer was under federal investigation for fraud involving a contract with which Shapiro had some involvement. After the discharge, Shapiro filed suit in the Circuit Court for Montgomery County, alleging three claims: breach of contract, wrongful discharge, and defamation. The jury returned a verdict for appellees on all claims, and Shapiro has appealed.

## Issues Presented

Shapiro presents a pentad of issues for our review:

1. Did the Court err by refusing to instruct the jury that if they found it was a minimum term contract, then under *Dorrance v. Hoopes*, 122 Md. 344, 90 A. 92, 94 (1914), it could only be broken before the end of the term by conduct which was gross, evil or actually injurious to the employer's business?

2. Did the Court err by not ruling as a matter of law that the employment agreement was a minimum term contract?

3. Did the Court err by refusing to instruct the jury on whether a job applicant has a duty [not] to disclose to prospective employers that his current employer is or had been under investigation?

4. Did the Court err by not ruling that Massengill's written and verbal statements to his employees and the unemployment office were defamatory *per se?*

5. Did the Court err in withdrawing punitive damages from jury consideration?

Our review of the record leads us to conclude that the court did not err in declining to rule, as a matter of law, that the employment contract in dispute was a term contract. Further, the court did not err in its instructions as to the concept of "good cause" to justify termination of a term contract, or in its instructions as to the tort of abusive discharge. We agree with Shapiro, however, that the court erred with respect to appellant's defamation claim and shall reverse and remand as

to that claim only. As a result, we decline to reach the punitive damages issue.

We shall address the substance of each assertion, but in a varied order, and not exactly as appellant has presented them.

### Factual Summary

For the purposes of this appeal, most of the relevant facts are undisputed.

Shapiro became a member of the West Virginia Bar in 1983. Thereafter, in 1986, Shapiro began working for Contel Federal Systems, Inc. ("Contel"), as one of twelve in-house contracts administrators. The federal government was one of Contel's customers. In August 1990, the Army discovered a discrepancy in a claim for payment submitted by Contel and initiated an investigation. Although Shapiro had not prepared the bills that were the focus of the investigation, he had drafted a transmittal letter for one of the bills in question. Nevertheless, Shapiro was never a subject of the investigation. Ultimately, the Army concluded that the discrepancies resulted from clerical error and no charges were ever lodged against anyone.

Even before the commencement of the Contel investigation, Shapiro had decided to pursue a private law practice. Accordingly, in July 1990, he took the Maryland Bar examination, which he passed, and began searching for opportunities to develop a law practice. In December 1990, Shapiro met Massengill, who expressed an interest in expanding his firm's practice, which then consisted primarily of personal injury and domestic cases, to include business and government contract components. During the negotiations which ensued, Shapiro made clear that he wanted a secure position, lasting at least a year, that could provide him with an opportunity to develop a client base for his own practice. Shapiro concedes that, during his employment discussions with Massengill, he never advised Massengill of the Contel investigation.

On January 31, 1991, Shapiro received an employment contract and an accompanying cover letter from Massengill.

Shapiro promptly signed the contract and, on April 1, 1991, he began working for Massengill. Of particular relevance to this dispute, the contract provided:

> *I expect the term of this arrangement to go for at least one year, assuming we both continue working as we anticipate.* However, *we each reserve the right to cancel the arrangement after 9 months* with the next 90 days to count as part of the year.
>
> If our efforts are successful, I expect to increase your salary appropriately each year after the first year. We will have to negotiate this based upon clients, earnings, and profits.... Also, it is my intent that if we are successful and work well together, then I will consider having you become a junior partner at the end of 3 years.

(Emphasis added).

On April 24, 1991, just three weeks after Shapiro began working for Massengill, Phillip Radoff, Contel's general counsel, advised Shapiro that the Army wanted to conduct a final interview of Shapiro before closing the investigation. The interview was purely voluntary; Shapiro could have declined to be interviewed. Radoff informed Shapiro that Contel would hire an attorney to represent Shapiro at this interview, if he wanted one. Shapiro then informed Massengill of the Contel investigation and his impending interview.

Massengill was angry that Shapiro had failed to inform him of the investigation, that Shapiro could be a witness in criminal proceedings, or perhaps—in the worst case—that Shapiro himself could even be indicted. Shapiro explained to Massengill that he did not disclose the Army's inquiry earlier because no one at Contel had ever been implicated of wrongdoing, he believed the matter had essentially been resolved prior to the time that he met Massengill, and he was never a subject of the inquiry. Moreover, he considered the investigation "insignificant," and therefore did not think it necessary to disclose it during his employment discussions with Massengill. Although Shapiro acknowledged that "anything is possible," he steadfastly denied that he could be indicted.

In addition, Shapiro specifically asked Massengill to call Radoff to confirm his story, but Massengill never did so. Nor did Massengill take any other steps to verify Shapiro's account. Instead, on May 3, 1991, just a month after Shapiro began working for Massengill, Shapiro was fired. Shortly thereafter, at a meeting of the firm's employees, Massengill explained his decision to discharge Shapiro.

Subsequently, at Shapiro's request, the Army's Special Agent in charge of the Contel investigation wrote Massengill a letter, dated May 16, 1991, confirming that "Mr. Shapiro was never the target of this investigation, nor has any wrongdoing been attributed to him." At trial, through deposition testimony, Massengill acknowledged that this letter reflected what Shapiro had told him on April 24, 1991. Massengill nonetheless sent a statement to the Department of Employment and Economic Development ("DEED"), dated May 20, 1991, opposing Shapiro's claim for unemployment benefits.[2]

Additional facts will be included where pertinent to our discussion of the issues presented.

### *Discussion*

### I. Breach Of Contract

*A. Term vs. At–Will*

Appellant argues that the employment contract was unambiguous and, therefore, the court erred in submitting to the jury the issue of whether the contract was terminable at will or provided a definite term. Instead, he claims the court should have ruled, as a matter of law, that the contract created a fixed term of employment.

---

**2.** DEED awarded Shapiro full unemployment benefits. Massengill appealed this decision, but the DEED Board of Appeals affirmed the award. Thereafter, Shapiro re-applied for further benefits. On August 28, 1991, upon inquiry by DEED, Massengill sent an identical copy of the allegedly defamatory statement to DEED. The parties dispute whether Massengill intended this second statement as an opposition to Shapiro's receipt of subsequent benefits.

An employment agreement may either be for a fixed term or at will. *Hrehorovich v. Harbor Hospital,* 93 Md.App. 772, 790, 614 A.2d 1021 (1992), *cert. denied,* 330 Md. 319, 624 A.2d 490 (1993); *Chai Mgmt., Inc. v. Leibowitz,* 50 Md.App. 504, 513, 439 A.2d 34 (1982). Generally, an employer or an employee may terminate an at-will employment relationship, for almost any reason or no reason, at any time. *Lee v. Denro,* 91 Md.App. 822, 829, 605 A.2d 1017 (1992); *Beery v. Md. Medical Laboratory,* 89 Md.App. 81, 94, 597 A.2d 516 (1991); *Haselrig v. Publ. Storage, Inc.,* 86 Md.App. 116, 122, 585 A.2d 294 (1991); *Castiglione v. Johns Hopkins Hosp.,* 69 Md.App. 325, 338, 517 A.2d 786 (1986); *see also Adler v. Amer. Standard Corp.,* 291 Md. 31, 35, 432 A.2d 464 (1981). An employment contract is deemed at will, and therefore terminable without cause, when it does not expressly specify a particular time or event terminating the employment relationship. *Staggs v. Blue Cross of Md., Inc.,* 61 Md.App. 381, 388, 486 A.2d 798, *cert. denied,* 303 Md. 295, 493 A.2d 349 (1985). On the other hand, when an employment contract specifies a definite term, it may only be terminated prior to the end of the term for just cause. *Chai Mgmt.,* 50 Md.App. at 513, 439 A.2d 34.

Shapiro alleges that Massengill breached the employment agreement by terminating him, without good cause, before the expiration of the term. Therefore, whether the employment contract was at will or for a fixed term is significant. If it was at will, as appellees claim, then Massengill was entitled to terminate Shapiro with or without good cause. But if it was for a stated term, as Shapiro argues, then the employer could only fire Shapiro for sufficient cause.

Construction of a contract is, in the first instance, a question of law for the court to resolve. *Suburban Hosp. v. Dwiggins,* 324 Md. 294, 306, 596 A.2d 1069 (1991). Where the language of a contract is clear and unambiguous, there is no room for construction and we "must presume that the parties meant what they expressed." *Gen'l Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261–62, 492 A.2d 1306 (1985). But if

the contractual language is ambiguous, the meaning of the contract is a matter for the trier of fact to resolve. *Fournier v. U.S. Fidelity & Guaranty Co.*, 82 Md.App. 31, 44, 569 A.2d 1299, *cert. denied,* 319 Md. 581, 573 A.2d 1337 (1990); *Nat'l Indemnity Co. v. Continental Ins. Co.*, 61 Md.App. 575, 579, 487 A.2d 1191 (1985).

In deciding whether a contract is ambiguous, the trial court must analyze the language of the contract, based on the plain meaning of the words used. *Pacific Indemnity Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 389, 488 A.2d 486 (1985); *Chesapeake Isle, Inc. v. Rolling Hills Development Co.*, 248 Md. 449, 453, 237 A.2d 1 (1968); *Sperling v. Terry*, 214 Md. 367, 369–70, 135 A.2d 309 (1957); *Admiral Builders Sav. & Loan Ass'n v. So. River Landing, Inc.*, 66 Md.App. 124, 128, 502 A.2d 1096 (1986). Whether a contract is term or at-will may turn on the intent of the parties. *Staggs,* 61 Md.App. at 388, 486 A.2d 798.

We review the court's threshold decision of ambiguity based on the "clearly erroneous" standard of Md. Rule 8–131(c). *Admiral Builders,* 66 Md.App. at 128–29, 502 A.2d 1096. "[A] trial court's conclusion that ambiguity exists in a writing is an exercise in judgment which should be overturned only if no reasonable suggestion of ambiguity can be entertained." *Id.*

Our review reveals no error in the court's conclusion that the contract was ambiguous. On the one hand, the contract provided for the right to cancel *after* nine months, implying that the right to cancel before nine months was not reserved. Indeed, Massengill does not dispute that Shapiro had indicated a keen desire that his employment last no less than one year, with at least 60 days notice prior to termination, in order to allow him adequate time to find other employment. Conversely, the contract indicates that the parties merely *expected* "the term of [employment] to go for at least one year," predicated on the *assumption* that "both continue working as [they] anticipate[d]." The precatory language, such as "I expect" and "assuming," undermines Shapiro's assertion that the contract was for a fixed term.

Ambiguity also derives from a review of the contract as a whole. Arguably, it anticipated that Shapiro's employment could continue for an indefinite duration. In that spirit, it addressed raises, profit sharing, and eventual partnership. *See Hrehorovich*, 93 Md.App. at 790, 614 A.2d 1021 (a contract not specifying a term is terminable at will). Moreover, the nature of the employment (the practice of law) does not, by itself, suggest a fixed term. *Compare*, however, *Sperling*, 214 Md. at 369–70, 135 A.2d 309 (implicitly, from the language and the circumstances, contract to build a single residential dwelling was a contract for a fixed term, particularly because the employee was not in the building business).

We conclude that the court was not clearly erroneous in ascribing ambiguity to the agreement. As a result, the court did not err in submitting to the jury the question of whether the contract was at-will or for a fixed term.[3]

### B. Jury Instruction On Termination For Cause

We do not know how the jury resolved the important question of whether the contract was for a fixed term or at will; the verdict sheet did not direct the jury to answer that question.[4] In order to address appellant's next complaint, we shall assume, *arguendo*, that the jury found that the contract was for a fixed term.[5] As we have noted, if the agreement provided for a specific term of employment, Shapiro could only be terminated during that term for "just cause." *Chai Mgmt.*, 50 Md.App. at 513, 439 A.2d 34.

The court instructed the jury, in pertinent part, as follows:

---

**3.** In this regard, the court instructed the jury that, "In the event of an ambiguity or uncertainty a contract of employment prepared by the employer must be construed against the employer."

**4.** Neither party requested that the jury return a special verdict pursuant to Md. Rule 2–522(c) and Shapiro did not request that the court ask the jury to clarify its verdict in favor of appellees. *Nails v. S & R, Inc.*, 334 Md. 398, 412, 639 A.2d 660 (1994) (judge can ask the jury to clarify or amend its initial general verdict until the jury has been discharged).

**5.** If the jury had concluded that the contract was at will, then the issue concerning the contested jury instruction obviously would be moot.

A material breach [of contract] by one party relieves the other party from the duty of performance. A breach is material if it affects the purpose of the contract in an important or vital way.

An employer may terminate an employee for suspected criminal activity or a sincere belief that the employee is untrustworthy.

An employment contract for a stated term may only be terminated before the end of the term for cause. . . .

If the employer claims he was fraudulently induced to enter the contract he must establish the fraud by clear and convincing evidence. . . .

*An employment contract may not be terminated for failure to disclose facts in applying for employment unless one, the facts not disclosed establish that the employee was unqualified or unfit for the job applied for and disclosure of such facts was specifically requested by the employer; and two, the employee deliberately withheld these facts to create a false impression about his qualifications and fitness for the position.*

No sinister or adverse inference should be or can be drawn from the fact that Mr. Shapiro accepted CONTEL's offer to provide an attorney for him for the Army's interview nor should a sinister or adverse inference be drawn from the fact that any person chooses to be represented by an attorney whether they are a witness in an investigation or for any other purpose.

\* \* \* \* \* \*

Contract provisions do not eliminate the basic principle that gives an employer the right to discharge for good cause even though such right is not stated in the agreement.

When an employer because of an employee's wrongful conduct can no longer place the necessary faith and trust in an employee he is entitled to dismiss such employee without penalty. This is especially true where the employee has a responsible position where faith and trust are required. The employer must act in good faith.

... Fraudulent inducement means that a party has been led to enter into an agreement to his or her disadvantage as a result of deceit.

Deceit means that the person entered the agreement based on the other party's wilful non-disclosure or false representation of a material fact which the other party had a duty to disclose.

\* \* \* \* \* \*

A fact not disclosed does not entitle a person to cancel a contract on the grounds of non-disclosure of the fact unless the fact was vital to the performance of the contract, was known to the party who did not disclose the fact and was not obtainable by the other party.

Further, a contract may not be canceled by one party because of undisclosed possibilities which were not susceptible of exact knowledge at the time of the negotiations.

*If a misrepresentation or non-disclosure is innocent, honest or unintentional it may not be relied on to ignore the express terms of a written contract.*

(Emphasis added).

Shapiro excepted to the court's instructions. In the event the jury were to find that the contract was for a fixed term, he asked the court to amplify its instructions on "cause," by providing the following instruction:

An employment contract for a stated term may only be terminated before the end of the term for cause. *An employment contract cannot be terminated for cause because of misconduct of the employee, unless the misconduct is actually injurious to the employer's business, or is gross or evil.* Mere suspicion or belief that an employee engaged in misconduct is not sufficient grounds for termination of an employment contract; rather, the employer must prove by a preponderance of the evidence that the employee in fact engaged in misconduct, and that the misconduct constituted sufficient cause to terminate the contract.

(Emphasis added). The court refused to give Shapiro's proposed instruction.

During deliberations, the jury sent a note to the court, asking, "If this is a term contract does the law say that the employer can breach a contract on the basis of mistrust even if evidence may prove the seeming deceit was not deliberate?" After consulting with counsel, the court wrote back, "Yes, under certain circumstances. You must rely on the evidence presented and the law as I have instructed you." [6] Shapiro excepted to this instruction and again requested that the court give his proposed instruction.

Based primarily on *Dorrance v. Hoopes,* 122 Md. 344, 90 A. 92 (1914), Shapiro argues here, as he did below, that "just cause" does not include acts of "misconduct," such as the failure to disclose information the employer considers material, unless the act "is actually injurious to the employer's business, or is gross or evil." Appellant relies on the following passage from *Dorrance* to support his position:

"Mere misconduct, not amounting to insubordination, or involving moral turpitude, or exercising a bad influence over other servants, or producing injury to the master's business, or members of the master's family, is not enough to warrant the discharge of a servant. The misconduct must be gross, or such as is incompatible with the relation, pernicious in its influence, or injurious to the master's business; and, in determining the question, *reference must always be had to the business or employment in which it arose,* and the relative social condition of the master and servant. *What might be regarded as improper or insolent in a servant toward one master, might not be so regarded toward another.*"

122 Md. at 350, 90 A. 92 (quoting *Wood on Master and Servant* § 109, at 210; emphasis ours). *See also Bright v. Ganas,* 171 Md. 493, 503–04, 189 A. 427 (1937) (quoting same language).

---

6. The court had previously informed the jury that the instructions were being videotaped, and that the jury was free to review this videotape during their deliberations.

**760**

We believe appellant's reliance on the passage quoted from *Dorrance* is misplaced. In *Dorrance*, the employer hired the employee for a fixed term to supervise farm hands, as well as to provide specified services on the farm. Later, the employer and the employee, in the presence of other employees, argued over who would pay the cost of repairs to certain equipment provided by the employee and his father. During the argument, the employer all but accused the employee's father of lying, and the employee responded angrily that he was inclined to believe his father over his employer. The employer then fired the employee, alleging insubordination. Affirming the jury verdict for the employee, the Court held that the employer had provoked the employee's conduct sufficiently to support the jury's verdict. *Id.* at 353, 90 A. 92.

*Dorrance* focused on insubordination; the employer was angry because the employee effectively called him a liar in front of the other employees. In *that* context, the Court concluded that just cause required either actual injury or gross or evil misconduct. Nothing in the Court's opinion in *Dorrance* mandates that *every* claim of "just cause" requires actual injury or gross misconduct. Moreover, and more to the point here, the Court specifically recognized that just cause may be based on "incompatibility" in the employment relationship and that the nature of the business or employment is also an important consideration.

The concept of "just cause" does not lend itself to a mathematically precise definition. Indeed, "[t]here is no single definition of what constitutes good cause for discharge." STANLEY MAZEROFF, MARYLAND EMPLOYMENT LAW § 3.3(A), at 189 (1990). Rather, whether conduct amounts to "just cause" necessarily varies with the nature of the particular employment. Simply put, what satisfies just cause in the context of one kind of employment may not rise to just cause in another employment situation. Similarly, misconduct that renders an employee "incompatible" with the employer may constitute "just cause," even if the action is not, as Shapiro would

require, "actually injurious to the employer's business, or ... gross or evil."

Under Md. Rule 2–520(b), the court must instruct the jury upon the law, either by giving particular instructions offered by the parties, by crafting its own, or by combining elements of both. A party is entitled to have his or her theory of the case presented to the jury, provided that the theory is legally and factually supported. *Levine v. Rendler*, 272 Md. 1, 320 A.2d 258 (1974); *see also, Schaefer v. Publix Parking*, 226 Md. 150, 152–53, 172 A.2d 508 (1961) ("There can be little doubt that all parties to a law suit are entitled to have the jury properly instructed upon their theories of the case."). The court, however, need not give any particular requested instruction if the matter is "fairly covered by instructions actually given," Rule 2–520(b), so long as the instructions correctly state the law. *Seargeant Co. v. Pickett*, 285 Md. 186, 193, 401 A.2d 651 (1979). If the instructions constitute a clear and accurate expression of the law, we will not reverse merely because of a failure in form. *Wilhelm v. State Traffic Safety Comm'n*, 230 Md. 91, 185 A.2d 715 (1962); *see also Blaw–Knox Constr. Equip. Co. v. Morris*, 88 Md.App. 655, 666–67, 596 A.2d 679 (1991) (trial court has wide discretion as to the form of instructions).

We conclude that the court's instructions satisfied the requisite criteria. The jury was properly and adequately instructed that an employer may not terminate for cause because of an "honest or unintentional" non-disclosure. In addition, the court did not err in advising the jury that an employer may discharge a term employee, who is in a position requiring trust, based on the employer's reasonable belief that the employee is untrustworthy.

"When an employer, because of an employee's wrongful conduct, can no longer place the necessary faith and trust in an employee, he is entitled to dismiss such employee without penalty. This is especially true where the employee has a responsible position where faith and trust are required."

*Chai Mgmt.*, 50 Md.App. at 512, 439 A.2d 34 (quoting *Barisa v. Charitable Research Foundation, Inc.*, 287 A.2d 679, 682 (Del.Super.Ct.), *aff'd* 299 A.2d 430 (Del.1972)); *cf. Townsend v. L.W.M. Mgmt., Inc.*, 64 Md.App. 55, 69–70, 494 A.2d 239, *cert. denied*, 304 Md. 300, 498 A.2d 1186 (1985) (employee discharged because results of polygraph test indicated he was a thief; discharge was for cause and was not wrongful).

We are mindful that this dispute involves two attorneys and, in the context of the legal profession, the court's instruction as to trustworthiness was particularly appropriate. The legal profession is grounded, after all, on integrity. Moreover, perceptions of integrity can be as important as the reality, good judgment is vital, and there is little room for a stain on one's reputation for honesty. To an employer maintaining a practice of law, personal characteristics involving candor, forthrightness, trustworthiness, honesty, judgment, and integrity may well constitute essential job requirements. Ensuring a high standard for personal character is especially important to legal employers because, when associates act dishonorably or dishonestly, the misconduct may discredit the entire firm.

In addition, character traits are certainly relevant to compatibility. An attorney/employer might reasonably use the degree to which a candidate for employment discloses embarrassing or damaging information as a yardstick of personal characteristics that are understandably important to the employer with whom the employee will be working and upon whom the employer will inevitably rely. Certainly, such traits—like compatibility itself—are inherently subjective; what one person thinks is good judgment or moral character or finds compatible may seem like poor judgment, questionable character, or incompatibility to another. Thus, one employer might reasonably want to know the extent to which an employee is connected to a criminal investigation, even if the employee is innocent, while another might not care at all. Nonetheless, it is not patently unreasonable for a prospective legal employer to expect disclosure of potentially embarrassing or unpleasant facts, even without asking for such information. Nor is it unreasonable for the employer to find it

unacceptable that the employee was not forthcoming. Similarly, the attorney-employer of another attorney could reasonably find nondisclosure indicative of poor judgment, untrustworthiness, and, ultimately, incompatibility, even if such nondisclosure would not constitute "just cause" in another employment context.

We emphasize that the issue is *not* whether Shapiro's conduct while employed by Contel—the extent of his involvement in the matter under investigation by the Army—could itself constitute cause for his dismissal. The question is whether the fact of the investigation, centering on a transaction in which Shapiro was at least peripherally involved, was a matter about which an attorney reasonably might want to be apprised in deciding whether to employ Shapiro in the first instance. If so, non-disclosure of that information—even if, in retrospect, it turns out to be wholly noninculpatory—may justifiably lead the attorney to question the employee's judgment and trustworthiness.

We cannot say, as a matter of law, that Shapiro's failure to disclose the investigation was unethical, immoral, deceptive, dishonest, or demonstrative of poor judgment, as Massengill claims. Neither can we say that Shapiro's failure to disclose did not amount to just cause from the employer's perspective. Under the circumstances of this case, it was squarely the jury's province to resolve whether, in the employment context of the legal profession, Shapiro's nondisclosure constituted good cause. The jury determined that it was, and we perceive no error.

## II. Wrongful Discharge

Shapiro contends that, even if he was an at-will employee, his termination constituted an abusive or wrongful discharge under *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981) and its progeny. As we have observed, with few exceptions, at-will employment is terminable by either party, at any time, for any reason whatsoever. *Adler*, 291 Md. at 35, 432 A.2d 464 (citing *St. Comm'n on Human Rel. v. Amecom Div.*, 278 Md. 120, 360 A.2d 1 (1976), *Vincent v.*

*Palmer*, 179 Md. 365, 19 A.2d 183 (1941), and *W., B. & A.R.R. Co. v. Moss*, 127 Md. 12, 96 A. 273 (1915)); *Denro*, 91 Md.App. at 829, 605 A.2d 1017. "The common law rule, applicable in Maryland, is that an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time." *Adler*, 291 Md. at 35, 432 A.2d 464. *See also Suburban Hosp. v. Dwiggins*, 324 Md. 294, 303, 596 A.2d 1069 (1991); *Hrehorovich v. Harbor Hospital*, 93 Md.App. at 784–85, 614 A.2d 1021; *Castiglione*, 69 Md.App. at 338, 517 A.2d 786. Nonetheless, the Court in *Adler* recognized a "narrow exception" to that rule, when the discharge contravenes a clear mandate of public policy. *Adler*, 291 Md. at 35, 432 A.2d 464. *See also Ewing v. Koppers Co., Inc.*, 312 Md. 45, 49, 537 A.2d 1173 (1988) (tort is also available to contractual employees); *Brandon v. Molesworth*, 104 Md.App. 167, 179, 655 A.2d 1292, 1298 (1995) (discussion of wrongful discharge); *Denro*, 91 Md.App. at 829–30, 605 A.2d 1017 (discussing definition of clear mandate of public policy); *Townsend v. L.W.M. Mgmt., Inc.*, 64 Md.App. 55, 60–61, 494 A.2d 239, *cert. denied*, 304 Md. 300, 498 A.2d 1186 (1985) (same).

The tort of wrongful or abusive discharge "is defined as the willful termination of employment by the employer because of the employee's alleged failure to perform in accordance with the employer's expectations and the termination is contrary to a clear mandate of public policy." *Allen v. Bethlehem Steel Corp.*, 76 Md.App. 642, 652, 547 A.2d 1105, *cert. denied*, 314 Md. 458, 550 A.2d 1168 (1988). Specifically, in order to state a claim for wrongful discharge, the employee must demonstrate: (1) that the employee was discharged; (2) that the dismissal violated some clear mandate of public policy; and (3) that there is a nexus between the defendant and the decision to fire the employee. *Leese v. Baltimore Co.*, 64 Md.App. 442, 468, 497 A.2d 159, *cert. denied*, 305 Md. 106, 501 A.2d 845 (1985). To prevail, however, the employee must demonstrate the policy in question with clarity, specificity, and authority: " '[R]ecognition of an otherwise undeclared public policy as a basis for a judicial decision involves the application of a very nebulous concept to the facts of the case,' a practice

which should be employed sparingly, if at all." *Lee v. Denro*, 91 Md.App. at 830, 605 A.2d 1017 (quoting *Adler*, 291 Md. at 45, 432 A.2d 464).

Shapiro contends that his discharge contravened two clear mandates of public policy: a policy favoring compliance with criminal investigations and a policy protecting the privacy of those who are subject to criminal investigations. The trial court instructed the jury that, for Shapiro to prevail on his claim of wrongful discharge, the jury had to find that Massengill discharged him "because of him going and testifying or being interviewed by [a government] agent." As to the second policy, appellant argues that he had an affirmative obligation *not* to disclose to a prospective employer that Contel was under criminal investigation. Nevertheless, the court refused to give appellant's proposed instruction:

There is no legal or ethical requirement or duty that an employee disclose to prospective employers that his current employer is under investigation, and there is no legal or ethical requirement or duty that job applicants disclose to prospective employers that they have been or may be a witness in such investigations.

The government conducts criminal investigations not only to determine *if* the law has been violated, but also to assure itself that the law has not been violated.

In fact, because disclosure of even the existence of a criminal investigation by law enforcement agencies or a grand jury can be very damaging to a company's or a person's reputation without any determination of guilt of such company or person, law enforcement agencies and the courts regard criminal investigations to be private, confidential and not subject to disclosure to third persons without a legitimate law enforcement need.

Consequently, there is no legal or ethical duty upon an applicant for a job to disclose the existence of an investigation of his employer to prospective employers. *Further, the employee has a duty of confidentiality to his current or past employer, and may not be refused employment or*

*retaliated against for protecting his employer's right to privacy by not disclosing the existence of an investigation.* (Underline in original; italics added).[7]

Shapiro essentially contends that, whenever an employer discharges an employee for refusing to violate a third party's privacy, such discharge is a violation of the clear mandate of public policy articulated in *Kessler v. Equity Mgmt., Inc.,* 82 Md.App. 577, 572 A.2d 1144 (1990).[8] Relying on *Kessler,* Shapiro argues that, if we do not find a clear mandate of public policy here, we will implicitly impose a duty upon all prospective employees to disclose the existence of any pending criminal investigation of former employers, subjecting all con-

---

**7.** Appellees contend that, as a threshold matter, the question of whether "it was against public policy for an employer to compel an employee to disclose information concerning a former employer" was not preserved for our review because the language of the jury instructions requested do not raise it. *See* Md. Rule 8–131(a). Based upon the italicized portion of this jury instruction request, and Shapiro's timely exceptions to the court's refusals to give the instruction, we see no merit to Massengill's contention that the issue was not preserved.

**8.** In addition, Shapiro relies on cases from federal courts in which agents of the federal government were asked to disclose the fact that certain individuals and companies were under criminal investigation; the courts routinely held that such disclosures would violate the right of privacy held by the subjects of criminal investigations. *See, e.g., U.S. Dep't of Justice v. Reporters Committee For Freedom Of The Press,* 489 U.S. 749, 767, 109 S.Ct. 1468, 1478–79, 103 L.Ed.2d 774 (1989); *U.S. v. Proctor & Gamble Co.,* 356 U.S. 677, 681 n. 6, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958); *Times Mirror Co. v. U.S.,* 873 F.2d 1210, 1216 (9th Cir.1989); *Stern v. Fed. Bureau of Investigation,* 737 F.2d 84, 91–92 (D.C.Cir.1984).

Unassailably, subjects of criminal investigations generally have an interest in ensuring nondisclosure of the fact that they are being investigated. Nevertheless, these cases are all inapposite, for essentially the same reason: They stand for the proposition that the *government,* as the party bringing the investigation, has a duty not to disclose such information, and the First Amendment does not give the press the right to force the government to disclose it. To a similar effect is Md.Code Ann., State Gov't Art. § 10–618(f) (1993), which lists the permissible reasons for denying public access to criminal investigation records. But these cases and statutory sections do not support Shapiro's contention that *anyone* having information relating to a pending criminal investigation has a duty not to disclose the identity of the target of that investigation.

cerned to the risk of being tarred "with the brush of guilty by association." At least implicitly, the duty to disclose would extend to purely personal information. We do not agree that the important policy articulated in *Kessler* was in any way implicated by Shapiro's discharge.

In *Kessler*, the landlord/employer discharged an employee for refusing to enter illegally the apartments of defaulting tenants, and to rummage through their personal papers for information useful for debt collection. In holding that the discharge constituted a violation of a clear mandate of public policy, we noted both statutory and constitutional protections guarding against the invasions of privacy that the plaintiff was instructed to commit. We focused, too, on the "treasured right" of privacy in one's home, *Kessler*, 82 Md.App. at 599, 572 A.2d 1144, a sacrosanct right well protected by the constitution. We also said:

> We need not decide whether discharging an at-will employee for refusing to commit *any* act that might technically be tortious would be "contrary to a clear mandate of public policy."

* * * * * *

> Had appellant carried out her instructions to invade tenants' constitutionally protected rights of privacy by snooping through their private papers, *she would have been subject to civil liability.* As Judge Eldridge, writing for the Court of Appeals in *Widgeon v. Eastern Shore Hospital Center*, 300 Md. 520, 479 A.2d 921 (1984), explicated, violations of state or federal constitutional rights are actionable wrongs. Indeed, ... *a violation of those rights could be remedied by an action at law for damages.*

82 Md.App. at 599–89, 572 A.2d 1144 (italics in original; underlining added).

Clearly, the general rule applicable to at-will employment is subject to a public policy exception. The challenge is in identifying "what constitutes a 'public policy,' the violation of which amounts to a cause of action" for wrongful discharge. *Denro*, 91 Md.App. at 829, 605 A.2d 1017. While "jurists to

this day have been unable to fashion a truly workable definition of public policy," *Md.–Nat'l Cap. P & P Comm'n v. Washington Nat'l Arena,* 282 Md. 588, 605, 386 A.2d 1216 (1978), we acknowledge that

> "public policy embodies a doctrine of vague and variable quality, and, unless deducible in the given circumstances from constitutional or statutory provisions, should be accepted as the basis of a judicial determination, if at all, only with the utmost circumspection. The public policy of one generation may not, under changed conditions be the public policy of another."

*Townsend,* 64 Md.App. at 61–62, 494 A.2d 239 (quoting *Patton v. United,* 281 U.S. 276, 306, 50 S.Ct. 253, 261, 74 L.Ed. 854 (1930)).

■ As in *Denro,* "[t]his case presents the familiar common-law problem of deciding where and how to draw the line between claims that genuinely involve the mandates of public policy and are actionable, and ordinary disputes between employee and employer that are not." *Id.* at 828, 605 A.2d 1017 (citing *Sheets v. Teddy's Frosted Foods, Inc.,* 427 A.2d 385, 387, 427 A.2d 385 (Conn.1980)). The line here must be drawn in favor of the employer; we hold that the court did not err in declining to recognize, as a matter of public policy, that Shapiro had a duty not to disclose the Contel investigation to appellees, or that his discharge contravened an important public policy to that effect.

In marked contrast to *Kessler,* Shapiro has not identified any statutory or constitutional basis for his claim of a clear mandate of public policy. Nor has Shapiro advanced any basis upon which he could have been held civilly or criminally liable for disclosure of the Contel investigation: Shapiro did not have a written employment contract with Contel; Contel did not impose an employment restriction (other than "general common sense") barring his disclosure of information concerning Contel; and the government did not require Shapiro to maintain the confidentiality of the Contel investigation. Absent some clear *mandate,* under which Shapiro actually could

be held responsible for a breach of public policy, we do not believe the "policy" of protecting the privacy of parties under criminal investigation constitutes a sufficiently clear *mandate* to support Shapiro's wrongful discharge claim.

Moreover, Shapiro's own conduct undercut his purported concern for Contel's privacy. In the face of the impending government interview, Shapiro immediately divulged the fact of the investigation to Massengill, without taking any steps to ensure Contel's privacy. Shapiro also characterized the matter as "insignificant."

■ The question is not whether discharging Shapiro for his failure to disclose was fair, justified, sensible, reasonable, or appropriate. Rather, the question is whether it was *wrongful, i.e.,* whether it violated a clear mandate of public policy. Absent that type of violation, employers can discharge at-will employees for no reason or even for a bad reason.

> What appellant overlooks . . . is the fact that mere termination of employment does not give rise to a cause of action for [wrongful] discharge. [If appellant] was an 'at-will' employee, appellee had an absolute right to fire [him] for *no* reason or for *almost any* reason without incurring any liability for doing so.

*Beery v. Md. Medical Laboratory, Inc.,* 89 Md.App. 81, 94, 597 A.2d 516 (1991), *cert. denied,* 325 Md. 329, 600 A.2d 850 (1992) (emphasis in original). *See also Lee v. Denro,* 91 Md.App. at 836, 605 A.2d 1017 ("[T]he fact that the employer does not have a good reason for the employee's discharge does not, in the absence of a clear violation of public policy, render the discharge 'abusive' or 'wrongful.' ").

What we said in *Beery* is equally apt here:

> Had [the employee] been guilty of the alleged misconduct, it would have been entirely proper and appropriate for the employer to fire [him]. Firing [him] on the basis of . . . unsubstantiated allegations, without proof and, indeed, without fully investigating the matter, may very well have been

improper—even foolish—but can hardly be said to contravene any clear mandate of public policy.

89 Md.App. at 94–95, 597 A.2d 516.

### III. Defamation

At a firm-wide meeting, held soon after Shapiro's termination, Massengill explained why he had discharged Shapiro so soon after hiring him. According to the testimony of Massengill's employees, Massengill said, among other things, that Shapiro had been the "subject" of an investigation, that he might be its "target," that Shapiro could be indicted, that as a manager he would be blamed as a matter of course for any wrongdoing discovered by the inquiry, and that they all might soon be reading about it in the newspapers. Moreover, Massengill alleged that Shapiro, aware that he was being investigated, intentionally did not so inform Massengill during the employment negotiations.

In addition, Massengill contested Shapiro's application for unemployment insurance benefits, without speaking to Radoff and notwithstanding the exculpatory letter sent by the Army's Special Agent. In the statement Massengill sent to DEED, he asserted the following:

On April 24, 1991 Mr. Shapiro advised me for the first time that he was going to be questioned in a criminal investigation being conducted by the federal government. He told me that he had been the contracts manager on the contract claim being investigated; that his former employer had retained a criminal law attorney to represent him; and, that he had been aware of this problem, and the investigation, both during our negotiations and at the time he came into my employ.

*Mr. Shapiro admitted to me that he could be indicted. He is the one who submitted the claim on behalf of his employer as contracts manager. Investigations of possible fraud by government contractors is a major focus at this time.*

Mr. Shapiro and I had discussed starting a business side to the practice which would also involve government contracting. . . . *Yet, he never told me that he was involved in a criminal investigation at any time during our negotiations nor prior to coming into my office. As an attorney, he had an ethical responsibility to tell me.*

\* \* \* \* \* \*

Had Mr. Shapiro advised me about *his problems,* he would never have been hired. I believe he knew that. *Mr. Shapiro, in my view, was ethically obligated to advise me. He did not do so and in fact told me he felt he had no duty to disclose something to me which went to the very core, ethically and morally, of our plans. I decided that I could no longer trust his ethics nor his judgment.*

(Emphasis added).

At the close of the evidentiary phase of the trial, the court ruled that Massengill's comments to his employees could not support an action for defamation, on the grounds that "there was absolutely no, zero, zero production of any evidence whatsoever that there was anything said by Mr. Massengill that could in any way have been construed as a reflection on the plaintiff." In contrast, the court determined that the letter to DEED could be considered defamatory, and so allowed the jury to consider it. The court said:

I am instructing you now that as a matter of law that the only defamation that you will be able to consider in this case is that if any which you find in a letter directed by Mr. Massengill to the unemployment commission.

I am instructing you specifically that you are not to consider any verbal, anything that he said to anybody and there were a number of employees, I believe, involved in this defamation. Okay, so that is not to be considered by you.

On appeal, Shapiro contends that the court erred in failing to rule as a matter of law that Massengill's statements, including both the statement to DEED and the verbal communications to Shapiro's co-workers, were defamatory per se.

Necessarily subsumed within this contention is the question of whether the court correctly analyzed the nature of the various statements. We are of the view that the alleged statements to the employees were defamatory per se and the court erred by refusing to allow the jury to consider those statements. We explain.

In a case involving a plaintiff who is not a public figure, a prima facie case of defamation requires proof of the following elements:

> (1) that the defendant made a defamatory communication—i.e., that he communicated a statement tending to expose the plaintiff to public scorn, hatred, contempt, or ridicule to a third person who reasonably recognized the statement as being defamatory; (2) that the statement was false; (3) that the defendant was at fault in communicating the statement; and (4) that the plaintiff suffered harm.

*Kairys v. Douglas Stereo Inc.*, 83 Md.App. 667, 678, 577 A.2d 386 (1990) (citing *Hearst Corp. v. Hughes*, 297 Md. 112, 466 A.2d 486 (1983) and *Gooch v. Md. Mechanical Systems, Inc.*, 81 Md.App. 376, 567 A.2d 954, *cert. denied*, 319 Md. 484, 573 A.2d 807 (1990)). "Fault," for the purposes of the prima facie case, may be based either on negligence or constitutional malice. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964); *Batson v. Shiflett*, 325 Md. 684, 728, 602 A.2d 1191 (1992); *Hearst Corp.*, 297 at 122, 466 A.2d 486 (citing *Jacron Sales Co. v. Sindorf*, 276 Md. 580, 350 A.2d 688 (1976)). *See also Restatement (2d) Torts* § 580B (1975) (fault standard for defamation of a private person).

Constitutional malice, which is sometimes referred to as actual malice, *Batson*, 325 Md. at 728, 602 A.2d 1191, is established when the plaintiff shows, by clear and convincing evidence, that the defendant published the statement in issue either with reckless disregard for its truth or with actual knowledge of its falsity. *Id. See also New York Times Co.*, 376 U.S. at 285–86, 84 S.Ct. at 728–29 (where plaintiff must demonstrate constitutional malice, malice must be shown with

"convincing clarity."). In contrast, negligence need only be shown by a preponderance of the evidence. *Gen'l Motors Corp. v. Piskor*, 277 Md. 165, 171–72, 352 A.2d 810 ("[T]he plaintiff shall be required to establish the liability of the defendant through proof of falsity and negligence by the preponderance of the evidence....").

Maryland continues to recognize the distinction between defamation per se and defamation per quod. *Hearst Corp.*, 297 Md. at 125, 466 A.2d 486 (citing *IBEW, Local 1805 v. Mayo*, 281 Md. 475, 379 A.2d 1223 (1977)); *Gooch*, 81 Md.App. at 393, 567 A.2d 954. The distinction between per se and per quod was explained in *Metromedia, Inc. v. Hillman*, 285 Md. 161, 400 A.2d 1117 (1979):

"In the case of words or conduct actionable per se their injurious character is a self-evident fact of common knowledge of which the court takes judicial notice and need not be pleaded or proved. In the case of words or conduct actionable only per quod, the injurious effect must be established by allegations and proof of special damage and in such cases it is not only necessary to plead and show that the words or actions were defamatory, but it must also appear that such words or conduct caused actual damage."

*Id.* at 163–64, 400 A.2d 1117 (quoting *M & S Furniture Sales Co. v. Edward J. DeBartolo Corp.*, 249 Md. 540, 241 A.2d 126 (1968)).

The determination of whether an alleged defamatory statement is per se or per quod is a matter of law. *Gooch*, 81 Md.App. at 391 n. 8, 567 A.2d 954. If the statement is per quod, then the jury must decide whether the statement does, in fact, carry defamatory meaning. *Helinski v. Rosenberg*, 90 Md.App. 158, 165, 600 A.2d 882, *rev'd on other grounds*, 328 Md. 664, 616 A.2d 866 (1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993).

The significance of whether the defamation is per se or per quod is intertwined with the issue of fault. If the

statement is actionable per se,[9] the plaintiff must prove actual damages if the defendant was merely negligent in making the false statement. *Hearst Corp.,* 297 Md. at 122, 466 A.2d 486; *Metromedia,* 285 Md. at 172, 400 A.2d 1117; *Jacron,* 276 Md. at 590, 350 A.2d 688. On the other hand, when a plaintiff establishes that the statement was made with actual malice, "a presumption of harm to reputation . . . arises from the publication of words actionable per se. A trier of fact is not constitutionally barred from awarding damages based on that presumption in a constitutional malice case." *Hanlon v. Davis,* 76 Md.App. 339, 356, 545 A.2d 72 (1988) ((citing *Hearst,* 297 Md. at 125–26, 466 A.2d 486)). Therefore, where the statement is actionable per se, damages are presumed if a plaintiff can demonstrate constitutional malice; the jury may award general damages for false words that are actionable per se, even in the absence of proof of harm. *Hearst Corp.,* 297 Md. at 125–26, 466 A.2d 486; *Laws v. Thompson,* 78 Md.App. 665, 685, 554 A.2d 1264, *cert. denied,* 316 Md. 428, 559 A.2d 791 (1989); *Hanlon,* 76 Md.App. at 355 n. 4, 356–57, 545 A.2d 72.[10]

In essence, Shapiro's defamation claim presents the flip side of Massengill's claim that he had cause to fire Shapiro. As we have observed, Massengill's decision to fire Shapiro was at least partly grounded on his concern that the firm's reputation for honesty might be tainted by Shapiro's connection to the Contel investigation. In much the same way, Shapiro claims

---

9. In *Gooch,* 81 Md.App. at 392 n. 9, 567 A.2d 954, we said that "'Actionable per se' is another term of art casually mentioned in defamation law which carries precisely the same meaning as defamation per se."

10. Even in a private defamation action, when the plaintiff proceeds on a theory that the statement was made with actual malice, the malice must be established by clear and convincing evidence. *Piskor,* 277 Md. at 175, 352 A.2d 810 (plaintiff "shall be required . . . to establish . . . negligence by the preponderance of the evidence. [Plaintiff] may then recover compensation for actual injury . . ., but not presumed or punitive damages unless he meets the New York Times standard [of constitutional malice]."); *cf. Owens–Illinois v. Zenobia,* 325 Md. 420, 460, 601 A.2d 633 (1992) (for punitive damages, actual malice always must be proven by clear and convincing evidence).

his reputation for integrity is of paramount importance to him professionally, and he was falsely denigrated by Massengill.

Massengill allegedly told his employees that Shapiro had been the "subject" and the "target" of a criminal investigation and that Shapiro had admitted that he could be indicted; Massengill strongly implied that Shapiro had intentionally concealed this damaging information. Allegations that Shapiro was evasive, secretive, dishonest, dishonorable, and perhaps even a criminal—if the jury finds that those statements were made and were, indeed, false—clearly "impute to [Shapiro] some incapacity or lack of due qualification," *Foley*, 188 Md. at 284, 52 A.2d 476, and "would disqualify him or render him less fit properly to fulfill the duties incident" to the practice of law. *Kilgour v. Evening Star Co.*, 96 Md. 16, 23, 53 A. 716 (1902).

What we said in *Leese v. Baltimore Co.* is pertinent here: [I]t is defamatory "to utter any slander or false tale of another . . . which may impair or hurt his trade or livelyhood." 3 W. Blackstone, *Commentaries on the Laws of England* 123 (special ed. 1983). Thus, a statement "that adversely affects [an employee's] fitness for the proper conduct of his business . . . [is] actionable *per se* at common law." *Hearst Corp. v. Hughes*, 297 Md. 112, 118, 466 A.2d 486 (1983).

This is not to imply, however, that every negative evaluation of an employee's performance is potentially defamatory. Rather, " *'[t]he words must go so far as to impute to him some incapacity or lack of due qualification to fill the position.'* " *Foley v. Hoffman*, 188 Md. 273, 284, 52 A.2d 476 (1947) [other citations omitted]. *In other words, the defamatory statement must be such that "if true, would disqualify him or render him less fit properly to fulfill the duties incident to the special character assumed." Kilgour v. Evening Star Co.*, 96 Md. 16, 23, 53 A. 716 (1902). 64 Md.App. at 473–74, 497 A.2d 159 (italics added). Accordingly, the trial court's categorical determination that Massengill's oral statements "could [not] in any way have been construed as a [defamatory] reflection on the plaintiff" was clearly erroneous.

In concluding that the oral statements to co-workers were defamatory per se, we find persuasive the Court's analysis in *Kilgour v. Evening Star Newspaper Co.*:

> "Words spoken of a person in his office, trade, profession, business or means of getting a livelihood, which tend to expose him to the hazard of losing his office, or which charge him with fraud, indirect dealings or incapacity and thereby tend to injure him in his trade, profession or business, are actionable without proof of special damage, even though such words if spoken or written of an ordinary person, might not be actionable *per se.*"

96 Md. at 23–24, 53 A. 716 (citations omitted). *See also* FOWLER V. HARPER ET AL., 2 THE LAW OF TORTS § 5.12, at 104 (2d ed. 1986) ("[I]t is actionable [per se] to impute professional dishonesty to a lawyer or to call a lawyer a quack or a shyster or a crook." (footnotes omitted)).

Analysis of Massengill's letter to DEED makes clear that it, too, was defamatory per se. The trial court analyzed the contents, sentence by sentence, considering each line in a vacuum. For example, the court found the sentence, "Mr. Shapiro admitted to me that he could be indicted," as unobjectionable because indictment, by itself, means nothing. Likewise, the court saw the sentence, "He is the one who submitted the claim on behalf of his employer as contracts manager," as entirely harmless. Finally, the court was untroubled by the sentence, "Investigations of possible fraud by government contractors is a major focus at this time," because it did not name Shapiro. But the words cannot be read in isolation. When read as a whole, the clear implication is that Shapiro had believed he was likely to be indicted for his own act of fraud upon the government, and deliberately concealed that information from Massengill.

 Later in the letter, Massengill accused Shapiro of outright deceit:

> [H]e never told me that he was involved in a criminal investigation at any time during our negotiations nor prior to coming into my office. As an attorney, he had an ethical

responsibility to tell me.... Mr. Shapiro, in my view, was ethically obligated to advise me. He did not do so and in fact told me he felt he had no duty to disclose something to me which went to the very core, ethically and morally, of our plans. I decided that I could no longer trust his ethics nor [sic] his judgment.

The reader of the letter does not have to refer to any outside facts to understand the implication that Shapiro's lack of ethics, and his "involvement" in a criminal investigation, rendered him unfit to be an attorney. Accordingly, Massengill's statements to DEED were defamatory per se.

Based on the foregoing, we believe it was for the jury to decide the following: (1) whether Massengill made the alleged statements; (2) whether the statements were false; (3) the degree of Massengill's fault; and (4) whether Massengill abused any qualified privilege that his words enjoyed.[11] The trial court erred in refusing to allow the jury to consider both the oral and written statements. Although the DEED letter was submitted to the jury, we cannot consider the letter and

---

11. We note that the letter to DEED was subject to a qualified privilege, by statute. Md.Code Ann., Lab. & Emp't Art., § 8–105 (1992). *See also Gay v. William Hill Manor, Inc.,* 74 Md.App. 51, 56, 536 A.2d 690 (1988) (predecessor statute). Massengill's oral communications to employees may also have been protected by the common law privilege extending to communications between an employer and an employee. *See, e.g., McDermott v. Hughley,* 317 Md. 12, 28–29, 561 A.2d 1038 (1989); *Exxon Corp.,* 67 Md.App. at 421, 508 A.2d 142 (citing cases); *Happy 40, Inc. v. Miller,* 63 Md.App. 24, 35, 491 A.2d 1210, *cert. denied,* 304 Md. 299, 498 A.2d 1185 (1985) (same).

When a statement enjoys a qualified privilege, the privilege defeats an action for defamation. *Jacron,* 276 Md. at 598, 350 A.2d 688. The question of whether a defamatory communication enjoys a qualified privilege is a matter of law for the court to resolve. *Exxon Corp. v. Schoene,* 67 Md.App. 412, 421, 508 A.2d 142 (1986) ((citing *Jacron,* 276 Md. at 600, 350 A.2d 688)).

A qualified privilege may be abused, and thus defeated, if the plaintiff can establish that the defendant acted with constitutional malice or that the statement was not made in furtherance of the reason for the privilege or was communicated to a third person who is outside the protection of the privilege. *Leese,* 64 Md.App. at 476, 497 A.2d 159. *See also, McDermott,* 317 Md. at 29–30, 561 A.2d 1038; *Marchesi v. Franchino,* 283 Md. 131, 139, 387 A.2d 1129 (1978); *Happy 40, Inc.,* 63

the oral statements independently; they collectively bear on questions of fault, privilege, and damages. Accordingly, as to the defamation claim, we must reverse and remand for a new trial.

**JUDGMENT REVERSED AS TO DEFAMATION CLAIM AND REMANDED FOR NEW TRIAL; JUDGMENT AFFIRMED AS TO ALL OTHER COUNTS.**

**COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY APPELLEE.**

Md.App. at 31–32, 491 A.2d 1210. The question of whether the defendant abused the privilege is an issue for the jury to decide. *Exxon Corp.*, 67 Md.App. at 421, 508 A.2d 142; *Happy 40*, 63 Md.App. at 34, 491 A.2d 1210.

We note that the quantum of proof necessary for a plaintiff to establish a claim of constitutional malice in the case-in-chief (*i.e.*, clear and convincing evidence) is greater than the degree of proof necessary to establish constitutional malice in order to overcome the affirmative defense of conditional privilege. *Compare, e.g., Batson*, 325 Md. at 728, 602 A.2d 1191 (public figure, who is constitutionally required to prove actual malice as part of a prima facie case, must produce clear and convincing evidence), *with Piskor*, 277 Md. at 173 n. 5, 352 A.2d 810 (abuse of privilege by excessive publication must be proven by preponderance standard, not clear and convincing), *and Globe Security Systems v. Sterling*, 79 Md.App. 303, 311, 556 A.2d 731 (1989) ("[A] conditional privilege is defeated by a private person if malice is shown by a preponderance of the evidence.").